984 A.2d 246

**Myron Xavier HICKS**

v.

**STATE of Maryland.**

**No. 2591, Sept. Term, 2007.**

Court of Special Appeals of Maryland.

Nov. 25, 2009.

Juan P. Reyes (Nancy S. Forster, Public Defender, on brief), Baltimore, for Appellant.

Douglas D. Guidorizzi (Douglas F. Gansler, Atty. Gen., on brief), Baltimore, for Appellee.

Panel: WRIGHT, KEHOE, and J. FREDERICK SHARER, (Retired, Specially Assigned) JJ.

KEHOE, J.

A jury sitting in the Circuit Court for Prince George's County convicted Myron Xavier Hicks, appellant, of possession of a firearm after a felony conviction, possession of a regulated firearm after a conviction for a disqualifying crime, and possession of a regulated firearm after conviction for a crime of violence. The jury acquitted appellant of carrying a handgun, transporting a handgun on a roadway, of obliterating

the identification number of a firearm, and of resisting arrest.[1] The sentencing court imposed a five-year term of incarceration, without parole, for each conviction, with the terms to run concurrently.

Appellant presents three questions for our review, which we quote:

 1. Did the lower court err in denying appellant's motion to suppress the firearm?

 2. Did the trial court err in allowing the jury to return inconsistent verdicts?

 3. Did the trial court err in denying appellant's motion to reconsider the prior motion for judgment of acquittal?

For the reasons that follow, we shall affirm the judgments below.

## BACKGROUND

The following facts were adduced at a suppression hearing held on August 24, 2007.

On April 25, 2007, Officer Noah Waters and Officer Kevron Gottlieb, of the Prince George's County Police Department, were working a "special overtime assignment" in Oxon Hill. About 11:02 p.m., the officers observed a blue four-door sedan parked at the gas pumps of a Shell gas station located at Wheeler Road and Southern Avenue. Two people occupied the vehicle: a driver, later identified as Milton Lee Jennings, and appellant, who was seated in the front passenger seat. The vehicle was not running, its lights were off, and the occupants were not pumping gasoline. The officers observed the vehicle and its occupants, who remained sitting in the car, for about 15 minutes.[2]

---

1. Appellant was also charged with second degree assault in relation to this incident. That charge, however, was severed from the other charges for trial purposes and *nol prossed* post trial.

2. The suppression record does not indicate where the officers were located or whether they were visible to the occupants of the vehicle parked at the gas pumps.

Officer Waters then observed Jennings get out of the vehicle. He testified that "another person approach[ed] him, they didn't have conversation, and it appeared to be a hand-to-hand—... There was no conversation. I observed the gentleman approach [Jennings] and exchange and just walk away." [3]

Officer Waters testified that he had been trained in the "recognition of drug transactions" and had been involved in many drug arrests. His testimony continued as follows:

[STATE]: Describe the hand-to-hand. What were the things that you were taught in your training that were the characteristics of a hand-to-hand transaction?

\* \* \* \* \* \*

WATERS: Usually, it's a manner that is obscured, so you really don't see what item is being exchanged. It is not a customary handshake that I guess we're used to, but it's an action with the palms touching palms and sliding through.

[STATE]: What, if any, items in this case did you see exchanged?

WATERS: I did not see what item was exchanged. I just saw the activity which was suspicious to me.

\* \* \* \* \* \*

[STATE]: Do you have any experience working in this area itself of Wheeler Road and Southern Avenue?

WATERS: Yes, sir, that is my assigned area.

[STATE]: How long have you worked in that particular area. WATERS: Approximately two years.

[STATE]: Based on your experience, can you describe that area?

\* \* \* \* \* \*

WATERS: There's a lot of drug activity in that area.

After observing the "hand to hand," Officers Waters and Gottlieb, both in uniform, approached the vehicle without guns

---

**3.** Officer Gottlieb did not observe the "hand to hand" as he was "looking at another area of the parking lot" when it occurred. Officer Waters, however, immediately advised him of what he saw.

drawn. Officer Waters asked Jennings what they were doing and "what did you just exchange with the gentleman that walked away."[4] Officer Waters directed Jennings to remove the car keys, which he then placed on the roof of the vehicle, "ordered" him to produce identification, and "ordered him out of the vehicle." He then did a "pat down" of Jennings for "officer safety." Officer Waters was also "looking for what [he] felt would be the result of a drug transaction." He did not, however, find any drugs, drug paraphernalia, or weapons on Jennings.

After Officer Waters completed his pat down of Jennings, Officer Gottlieb "ordered" appellant out of the vehicle "and he stepped out." Officer Gottlieb described what happened next:

> GOTTLIEB: I positioned [appellant] with his face away from me towards the car, and told him . . . to interlock his fingers and put his hands over his head and he didn't do it. He said, you know, "I ain't done nothing, why are you messing with me," and started to turn towards me a little bit and I was pushing him back towards the car and asked him to do it again. He said, "I ain't done nothing." And he was looking back towards me. I just attempted to control him. And at one point he threw his right elbow back at me, missed, and got on the grass and ran toward the back of the car. I ran after him and caught up to him at the back of the car, pulled him to the ground, and Officer Waters came over and assisted and he was, basically, fighting us, elbowing us, trying to get away from us. At one point I said,[" '] You're under arrest for assault, stop resisting.[" ] And he continued to struggle until we got control of his wrist and were able to handcuff him.

* * * * * *

---

**4.** Jennings' response to those questions, if any, are not reflected in the record of the suppression hearing. That record does indicate, however, that in a statement subsequently given by him to Officer Gottlieb, Jennings related that "they were going to the liquor store and they stopped at a gas station and they saw a friend and he [Jennings] got out and shook his hand . . . and then [he] got back in the car."

[STATE]: Once you had gotten the defendant on to the ground, what, if anything, did you do?

GOTTLIEB: After we got him down on the ground and we got him handcuffed, then he was under arrest, and I got him up in order to search him before transporting him. At one point I reached into his right front pocket and I pulled out a black handgun and it turned out to be a Davis Industries .380 automatic handgun. We cleared it for safety reasons. It had a round in the chamber and two in the magazine.

[STATE]: Why did you place him under arrest?

GOTTLIEB: Because he assaulted me and he assaulted Officer Waters. Officers Waters and Gottlieb were the only witnesses at the suppression hearing.

Defense counsel argued that the handgun recovered from appellant should be suppressed because the police did not have probable cause or a reasonable articulable suspicion justifying the stop and frisk of appellant. The court denied the motion, stating:

THE COURT: All right. As both sides know, I have to look at the totality of the circumstances. When [the driver] and the defendant, Hicks as a passenger, were sitting at a gas station for 10 to 15 minutes . . . not purchasing gas, just sitting there, and then somebody comes up and one of the officers observes what appears to him by his training and experience [to be] a hand-to-hand transaction, that is reasonable articulable suspicion to investigate.

What you're overlooking, [defense counsel], is the fact that they're sitting there at a gas pump for 10 to 15 minutes doing nothing. That is not [sic] in a high drug area. As far as this member of the bench is concerned, that certainly gives them reasonable articulable suspicion to investigate. That's not what, generally, persons do, sit at a pump and not get gas.

Once they go to investigate it, the officer does have the right to ask the passengers to get out of the car. And once they've asked them to get out of the car, they do have the

right to search for weapons. For officer safety, the officer does have the right to detain Mr. Hicks temporarily and do a pat down search. When Mr. Hicks decides he wants to resist and starts elbowing the police officer, he is then arrested for assault. Once he's placed under arrest for unlawful assault, they certainly have the right to do the search. When doing the search, they find out that he has a revolver on him. Motion to suppress is denied.

Additional facts will be provided as needed for a discussion of the issues.

## DISCUSSION

### I

### *The Motion to Suppress the Handgun*

Appellant contends that the trial court erred in denying the motion to suppress the handgun. Specifically, appellant claims that, even if Officer Waters observed what he thought was a hand-to-hand transaction outside the vehicle between Jennings and a third person, that "could not provide the required individualized suspicion to stop and frisk appellant." Moreover, he asserts that, "by the time of appellant's frisk, [Jennings] had already been searched and nothing had been discovered," and thus any "reasonable suspicion to initiate an investigatory stop ... was dispelled once the initial contact and search of [Jennings] yielded nothing." Appellant further maintains that Officer Gottlieb "had no right to restrict [his] freedom to leave the scene and certainly had no right to tackle [him] when he chose to leave," and thus, he was "entitled to resist an unlawful arrest."

The State counters that the trial court did not err in finding that the police had a reasonable, articulable suspicion to conduct a stop and frisk, but, even assuming it was not reasonable, appellant's "assault on the officer during his resistance to the stop and frisk was not privileged and provided probable cause for his arrest." Thus, the State asserts that the trial court properly denied the motion to suppress the

handgun as it was the fruit of a lawful search incident to a lawful arrest.

When determining whether a detention or search of an individual's person or property violates the Fourth Amendment, we " 'make our own independent constitutional appraisal by reviewing the law and applying it to the facts of the case.' " *Crosby v. State*, 408 Md. 490, 505, 970 A.2d 894 (2009) (quoting *State v. Williams*, 401 Md. 676, 678, 934 A.2d 38 (2007)). However, our assessment is performed within certain limitations. First, we look only to the record of the suppression hearing. *Owens v. State*, 399 Md. 388, 403, 924 A.2d 1072 (2007), *cert. denied*, —— U.S. ——, 128 S.Ct. 1064, 169 L.Ed.2d 813 (2008); *Paulino v. State*, 399 Md. 341, 348, 924 A.2d 308 (2007) (citing *Carter v. State*, 367 Md. 447, 457, 788 A.2d 646 (2002)), *cert. denied*, 552 U.S. 1071, 128 S.Ct. 709, 169 L.Ed.2d 571 (2007). Second, we defer to "the findings of the motions court as to first-level findings of fact and as to the credibility of witnesses, unless those findings are clearly erroneous." *Brown v. State*, 397 Md. 89, 98, 916 A.2d 245 (2007). Finally, " 'we view the evidence and inferences that may be reasonably drawn therefrom in a light most favorable to the prevailing party on the motion....' " *Owens*, 399 Md. at 403, 924 A.2d 1072 (quoting *State v. Rucker*, 374 Md. 199, 207, 821 A.2d 439 (2003)).

The Fourth Amendment [5] to the United States Constitution protects against unreasonable searches and seizures, "including seizures that involve only a brief investigative detention." *Crosby*, 408 Md. at 505, 970 A.2d 894 (citations omitted). "The default rule requires that a seizure of a person by a law enforcement officer must be supported by probable cause, and, absent a showing of probable cause, the seizure violates the Fourth Amendment." *Id.* There are exceptions. " 'A police

---

5. The Fourth Amendment, provides:

> The right of people to be secure in their person, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

officer who has reasonable suspicion that a particular person has committed, is committing, or is about to commit a crime may detain that person briefly in order to investigate the circumstances that provoked suspicion.'" *Id.* at 506, 970 A.2d 894 (quoting *Nathan v. State,* 370 Md. 648, 660, 805 A.2d 1086 (2002) and citing *Terry v. Ohio,* 392 U.S. 1, 17, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).

Reasonable suspicion "'has been defined as ... a particularized and objective basis for suspecting the particular person stopped of criminal activity....'" *Crosby,* 408 Md. at 507, 970 A.2d 894 (quoting *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981) and *Stokes v. State,* 362 Md. 407, 415, 765 A.2d 612 (2001)). In *Crosby,* the Court of Appeals explained:

First, reasonable suspicion is a "common sense, nontechnical conception that considers factual and practical aspects of daily life and how reasonable and prudent people act." *Bost v. State,* 406 Md. 341, 356, 958 A.2d 356 (2008) (quoting *Stokes,* 362 Md. at 415, 765 A.2d 612). While the level of required suspicion is less than that required by the probable cause standard, reasonable suspicion nevertheless embraces something more than an "inchoate and unparticularized suspicion or 'hunch.'" *Terry,* 392 U.S. at 27, 88 S.Ct. 1868.

Second, a court's determination of whether a law enforcement officer acted with reasonable suspicion must be based on the totality of the circumstances. *Bost,* 406 Md. at 356, 958 A.2d 356. Thus, "the court must ... not parse out each individual circumstance for separate consideration." *Ransome v. State,* 373 Md. 99, 104, 816 A.2d 901 (2003). As recently articulated by the Fourth Circuit, "context matters: actions that may appear innocuous at a certain time or in a certain place may very well serve as a harbinger of criminal activity under different circumstances." *United States v. Branch,* 537 F.3d 328, 336 (2008).... In making its assessment, the court should give due deference to the training and experience of the law enforcement officer who engaged the stop at issue. *Ransome,* 373 Md. at 104–05, 816 A.2d

901. Such deference "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them." *[United States v.] Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). To be sure, "[a] factor that, by itself, may be entirely neutral and innocent, can, when viewed in combination with other circumstances, raise a legitimate suspicion in the mind of an experienced officer." *Ransome*, 373 Md. at 105, 816 A.2d 901.

Third, the reasonable suspicion standard carries limitations; it "does not allow [a] law enforcement official to simply assert that innocent conduct was suspicious to him or her." *Bost*, 406 Md. at 357, 958 A.2d 356. Rather, the officer must explain how the observed conduct, when viewed in the context of all of the other circumstances known to the officer, was indicative of criminal activity. . . . As this Court observed previously, we shall not " 'rubber stamp' conduct simply because the officer believed he had the right to engage in it." *Ransome*, 373 Md. at 111, 816 A.2d 901. In other words, there must be an "articulated logic to which this Court can defer." *United States v. Lester*, 148 F.Supp.2d 597, 607 (D.Md.2001).

*Id.* at 507–09, 970 A.2d 894 (Some internal citations omitted).

██ In the case before us, we hold that the suppression court did not err in denying the motion to suppress the handgun. We perceive no error in the suppression court's conclusion that Officers Waters and Gottlieb reasonably suspected that criminal activity may have been afoot and that this suspicion was sufficient to support the investigatory detention of Jennings and appellant. Jennings' vehicle was parked for about 15 minutes in front of fuel pumps, but with no indication that the occupants were buying gasoline. The officers knew that the area was known for "a lot of drug activity." It was late at night. Officer Waters observed Jennings exit his car, engage in what he believed, based on his training and experience, to be a "hand to hand" drug transaction. There was no conversation between Jennings and the pedestrian and Jennings immediately returned to his vehicle. The totality of

these circumstances support a reasonable suspicion of drug-related activity and the officers properly detained Jennings and appellant, who had been sitting in Jennings' vehicle for at least 15 minutes, for the purpose of conducting a *Terry* investigation. *See, e.g. Williams v. State,* 188 Md.App. 78, 95–96, 981 A.2d 46, 56 (2009) (police officer's observation, through video surveillance of a street corner associated with open air drug sales, of an apparent hand-to hand drug transaction involving defendant constituted sufficient probable cause to justify an arrest even though officer did not observe what changed hands).

■ Appellant contends that, since the pat-down of Jennings did not yield evidence of criminal wrongdoing, any "reasonable suspicion to initiate an investigatory stop ... was dispelled." The argument is not persuasive. The purpose of a pat-down or frisk is to determine whether an individual has a weapon on his or her person and is a " 'carefully limited search of the outer clothing' " of the individual. *Dashiell v. State,* 374 Md. 85 n. 3, 821 A.2d 372 (2003) (quoting *Terry,* 392 U.S. at 30, 88 S.Ct. 1868). A pat down is intended solely to protect the investigating officer and any other persons in the vicinity. *Terry,* 392 U.S. at 23, 88 S.Ct. 1868. That Jennings did not have a weapon concealed on his person was not, in and of itself, a basis to conclude that the officers' suspicions of criminal wrongdoing were groundless and certainly did not require them to curtail their *Terry* investigation.[6]

---

**6.** Appellant's reliance on *Dennis v. State,* 342 Md. 196, 674 A.2d 928 (1996) *(Dennis I),* for the proposition that appellant was free to depart the scene without permission from the police officers is equally misplaced. In *Dennis I,* the defendant, a passenger in a vehicle stopped for a traffic violation, attempted to walk away from the vehicle even though the police ordered him to remain. In ruling that his subsequent detention was illegal, the Court of Appeals noted "there ordinarily is no reason to believe that a passenger in a vehicle is guilty, as an accessory or aider and abettor, of the traffic offense with which the driver may be charged." *Id.* at 206, 674 A.2d 928. The police officer involved testified that Dennis was detained " 'for officers' safety," *id.* at 208, 674 A.2d 928, and the Court concluded that, under the circumstances, a concern for officer safety was an insufficient basis to justify detaining him. *Id.* at 209, 674 A.2d 928. *See Dennis v. State,* 345 Md. 649, 654,

■ Officer Gottlieb was entitled to pat appellant down before speaking to him if he had a " 'reasonable suspicion that [appellant] may be armed ... and dangerous.' " *Arizona v. Johnson,* 129 S.Ct. at 784 (quoting *Knowles v. Iowa,* 525 U.S. 113, 117–18, 119 S.Ct. 484, 142 L.Ed.2d 492 (1998)). For reasonable suspicion to exist "[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry,* 392 U.S. at 27, 88 S.Ct. 1868. We have often recognized the inherent dangers of drug enforcement, and an investigatory stop based upon a reasonable suspicion that a suspect is engaged in drug dealing, can justify a frisk for weapons. *Burns v. State,* 149 Md.App. 526, 817 A.2d 885 (2003) ("The intimate connection between guns and narcotics is notorious."); *Whiting v. State,* 125 Md.App. 404, 417, 725 A.2d 623 (1999) ("[W]e have acknowledged a nexus between drug possession and guns, observing that a person involved in drug distribution is more prone to possess firearms than one not so involved."); *Banks v. State,* 84 Md.App. 582, 591, 581 A.2d 439 (1990) ("Possession and, indeed, use, of weapons,

693 A.2d 1150 (1997) *(Dennis II)* (affirming *Dennis I* after remand pursuant to *Maryland v. Dennis,* 519 U.S. 802, 117 S.Ct. 40, 136 L.Ed.2d 4 (1996)).

*Dennis* was a traffic stop case. The Supreme Court has since made it clear that, even in routine traffic stops,

[a] lawful roadside stop begins when a vehicle is pulled over for investigation of a traffic violation. The temporary seizure of driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop. Normally, the stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave.

*Arizona v. Johnson,* —— U.S. ——, 129 S.Ct. 781, 788, 172 L.Ed.2d 694 (2009) (citing *Brendlin v. California,* 551 U.S. 249, 258, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007)).

The instant case did not involve a traffic stop as the officers did not approach the vehicle because they suspected the driver had committed a traffic offense; the officers approached appellant and his companion because the officers had a reasonable suspicion that a drug transaction had just occurred. Nonetheless, the rationale of *Arizona v. Johnson* is fully applicable—the appellant was not free to leave the scene of the *Terry* stop.

most notably firearms, is commonly associated with the drug culture ..."). We conclude that Officer Gottlieb would have been justified in patting down the appellant before he spoke to him about the apparent drug transaction that Officer Waters had just witnessed.

In fact, however, Officer Gottlieb's attempt to frisk appellant was abortive. Although appellant stepped out of the vehicle when ordered to do so, he was uncooperative and combative when directed to take a stance to allow the officer to frisk him. Officer Gottlieb testified that "at one point [appellant] threw his right elbow back at me, missed, ... and ran toward the back of the car ... and he was, basically, fighting us, elbowing us, trying to get away from us." Appellant's conduct changes the focus of our analysis. There is no privilege to resist either an unlawful *Terry* stop, *Barnhard v. State*, 86 Md.App. 518, 528, 587 A.2d 561 (1991), *aff'd*, 325 Md. 602, 602 A.2d 701 (1992), or an unlawful frisk. *State v. Blackman*, 94 Md.App. 284, 306, 617 A.2d 619 (1992) ("Even if the frisk would have been unlawful ..., there was no right or privilege on the part of the [defendant] to resist it by using force against the officer.") Appellant's thrust of his elbow at Officer Gottlieb was an assault and appellant continued to elbow and fight the officers. Officer Gottlieb arrested appellant for assault and, pursuant to that arrest, lawfully searched him and recovered the handgun from his right front pocket. The arrest and the resulting search were justified. *Blackman*, 94 Md.App. at 305, 617 A.2d 619 ("[T]he [defendant] was not privileged to resist [the frisk] by shoving the officer. That shove, albeit arguably minimal, was a battery. That was all that was required to justify the arrest of the [defendant] and the search incident thereto.")

## II

### *The "Inconsistent" Verdicts*

After a jury trial, appellant was convicted of possessing a firearm after a felony conviction, in violation of Md.Code Ann.

Crim. Law [7] § 5–622 (2002, 2006 Supp.); [8] of possessing a regulated firearm after conviction of a disqualifying crime, in violation of Md.Code Ann. Pub. Safety [9] § 5–133(b)(1) (2003, 2006 Supp.); [10] and possession of a regulated firearm after conviction of a crime of violence, in violation of Pub. Safety § 5–133(c) [11] (collectively the "possession" convictions). He was acquitted of carrying a handgun in violation of Crim. Law § 4–203(a)(1)(i) [12], and of transporting a handgun in violation of Crim. Law § 4–203(a)(1)(ii). [13]

Appellant contends that the jury rendered "wholly inconsistent" verdicts, as he could not "have possessed the gun without also necessarily carrying it on his person." Appellant, therefore, claims that his convictions for possession of a firearm must be vacated. Although not conceding that he was required to object to any inconsistency in the jury's verdict,

---

7. This article will hereinafter be referred to as "Crim. Law."

8. Crim. Law § 5–622(b)(1) provides: "A person may not possess, own, carry, or transport a firearm if that person has been convicted of: a felony under this [controlled dangerous substances] title."

9. This article will hereinafter be referred to as "Pub. Safety."

10. Pub. Safety § 5–133(b)(1) provides: "A person may not possess a regulated firearm if the person: has been convicted of a disqualifying crime."

11. Pub. Safety § 5–133(c)(1) provides: "A person may not possess a regulated firearm if the person was previously convicted of: a crime of violence; or [enumerated violations of the Crim. Law Article]."

12. Crim. Law. § 4–203(a)(1)(i) provides: "Except as provided in subsection (b) of this section, a person may not: wear, carry, or transport a handgun, whether concealed or open, on or about the person."

13. Crim. Law. § 4–203(a)(1)(ii) provides: "Except as provided in subsection (b) of this section, a person may not: wear, carry, or knowingly transport a handgun, whether concealed or open, in a vehicle traveling on a road or parking lot generally used by the public, highway, waterway, or airway of the State."

The parties stipulated that appellant had been convicted of a crime that would disqualify him from possessing a regulated firearm. The court, therefore, informed the jury that "[t]he only question ... is whether [appellant] possessed a regulated firearm."

appellant maintains that his failure to do so does not preclude our review under the plain error doctrine.

 The State counters that, as the defense did not timely object to the verdicts, the issue is not preserved for appeal and the plain error review advocated by appellant is not warranted in this case. In any event, the State contends that, at best, the verdicts may be "factually inconsistent," but they are not "legally inconsistent" and, therefore, the convictions should be affirmed.[14]

---

**14.** A jury verdict is legally inconsistent when "essential elements of the counts of which the defendant is acquitted are identical and necessary to prove the count of which the defendant is convicted...." *Price*, 405 Md. at 36, n. 3, 949 A.2d 619 (quoting *State v. Arroyo*, 844 A.2d 163, 171 (R.I.2004)) (Harrell, J., concurring). As we explain in Part III, while the State is required to prove that a handgun is operable in order to support a conviction under Crim. Law § 4–203(a), we conclude that no such showing is necessary to convict under Pub. Safety § 5–133. There was no legal inconsistency in the verdicts rendered in this case.

The verdicts were, arguably, factually inconsistent. The appellant was in possession of a handgun when he was arrested and Officer Gottlieb testified that the firearms examiner was able to fire the handgun after the examiner "work[ed] on it a little bit." However, the firearms examiner did not testify and Officer Gottlieb conceded that he was not a firearms expert. In addition, he admitted that he was unable to describe the specific actions the firearms examiner took before the weapon was fired. While the jury was not specifically instructed that, in order to convict appellant of violating either Crim. Law § 4–203(a)(1)(i) or (ii), the State had to prove that the handgun was operable, the Assistant State's Attorney explicitly conceded the point in his closing argument. Under the circumstances, the jury may well have concluded that the State did not prove the operability of the firearm beyond a reasonable doubt.

Regarding the counts alleging violations of Pub. Safety § 5–133, the trial court instructed the jury that

For the purpose of this case a regulated firearm is defined as a firearm with a barrel of less than 16 inches, that expels or is designed to expel, or may be readily converted to expel a projectile by the action of an explosive or the frame or receiver of such a weapon.

In his opening statement, appellant's trial counsel stated that, when appellant was arrested, the police found "a gun that didn't even work in his pocket." The jury may have concluded that a person in possession of a handgun, even an inoperable one, was, *a priori*, also in possession of the handgun's "frame or receiver," a predicate for conviction under Pub. Safety § 5–133.

This case illustrates Judge Harrell's observation that "[a]ppellate courts are ill equipped to determine whether a jury's verdict is illogical

Prior to the landmark case of *Price v. State*, 405 Md. 10, 949 A.2d 619 (2008), Maryland appellate courts generally tolerated inconsistent verdicts in criminal jury trials. *Id* at 18, 949 A.2d 619. *See, e.g., State v. Williams*, 397 Md. 172, 189, 916 A.2d 294 (2007) ("It has been the position of this Court that inconsistent verdicts in jury trials are permissible in criminal cases.") In *Price*, the Court of Appeals held that inconsistent jury verdicts in criminal trials are no longer permissible. *Id.* at 18–29, 949 A.2d 619. As we noted in *Brown v. State*, 182 Md.App. 138, 155 n. 10, 957 A.2d 654 (2008), the "*Price* Court limited the effect of its holding, however, to 'similarly situated cases on direct appeal *where the issue was preserved*, and verdicts in criminal jury trials rendered after the date of our opinion. . . .'" (quoting *Price*, 405 Md. at 29, 949 A.2d 619; emphasis added in *Brown*). The *Price* opinion was filed on June 9, 2008. The verdict in the case before us was rendered on October 30, 2007. Therefore, assuming *arguendo* that the verdicts were inconsistent, *Price* is controlling here only if the issue was preserved.

The concurring opinion in *Price*, authored by Judge Harrell (joined by Judge Battaglia and in part by Judge Wilner), elaborated on the need to preserve the issue for appeal noting that, "[b]ecause of the 'sea change' announced by the Majority's opinion, some prospective direction is necessary and desirable to highlight the procedure required in order for a defendant to preserve for appellate review a challenge to a legally inconsistent verdict." *Price*, 405 Md. at 40, 949 A.2d 619. Judge Harrell explained:

The jury may render a legally inconsistent verdict to show lenity to the defendant. The defendant should not be foreclosed from accepting the jury's lenity as a result of the holding of the Majority's opinion. Nevertheless, we should not permit the defendant to accept the jury's lenity in the

factually, or merely 'curious.' We must be careful not to 'confuse a curious verdict with an inconsistent verdict.'" *Price*, 405 Md. at 36, n. 3, 949 A.2d 619 (quoting *Hudson v. State*, 152 Md.App. 488, 515, 832 A.2d 834 (2003)).

trial court, only to seek a windfall reversal on appeal by arguing that the jury's verdicts are inconsistent. Accordingly, a defendant must note his or her objection to allegedly inconsistent verdicts prior to the verdicts becoming final and the discharge of the jury. Otherwise, the claim is waived.[ ]

\* \* \* \* \* \*

Upon timely objection by the defendant [] to legally inconsistent verdicts, the trial court should instruct or re-instruct the jury on the need for consistency and the range of permissible verdicts. The jurors then should be permitted to resume deliberation. The jury is free to resolve the inconsistency either by returning verdict in the defendant's favor, convicting on the implicated counts, or deadlocking on a charge so that no inconsistent findings result. . . .

In sum, a defendant must note his objection to the inconsistent verdict while the trial court has an opportunity to remedy the error, i.e., before the verdict is final and the jury is discharged. Failure to do so constitutes waiver. *Id.* at 40–42, 949 A.2d 619 (footnotes, citations and internal quotation marks omitted).

We heeded Judge Harrell's admonition in *Tate v. State,* 182 Md.App. 114, 136–37, 957 A.2d 640 (2008), although our holding rested on other grounds. In *Tate,* before us on remand from the Court of Appeals for reconsideration of our opinion in light of *Price,* we noted that "the appellant clearly did nothing by way of objecting to the reception of the verdicts or by way of asking that the jury be sent back to resolve any alleged inconsistency in its verdicts." *Id.* at 136–37, 957 A.2d 640. The same is true here.

We hold that the issue of possible inconsistencies among the verdicts was not preserved for appeal as the defense did not object to the allegedly inconsistent verdicts at trial. Moreover, we decline appellant's invitation to exercise our discretion to review the issue under the plain error doctrine. We undertake "plain error" review only when the error is " 'compelling, extraordinary, exceptional or fundamental to assure

the defendant a fair trial.'" *Conyers v. State,* 345 Md. 525, 563, 693 A.2d 781 (1997) (quoting *State v. Hutchinson,* 287 Md. 198, 203, 411 A.2d 1035 (1980)). "Consequently, appellate review under the plain error doctrine '1) always has been, 2) still is, and 3) will continue to be a rare, rare phenomenon.'" *Hammersla v. State,* 184 Md.App. 295, 306, 965 A.2d 912 (2009) (quoting *Morris v. State,* 153 Md.App. 480, 507, 837 A.2d 248 (2003), *cert. denied,* 380 Md. 618, 846 A.2d 402 (2004)).

## III

### *The Motion To Reconsider*

At trial, Officer Gottlieb testified that he recovered a handgun from appellant's right front pants pocket. He further testified that there "was a round in the chamber and two in the magazine. The gun was ready to be fired." Officer Gottlieb took the handgun to the Firearms Examination Unit, "at which point one of the examiners, they did work on it a little bit and then they did a test fire and it fired." When asked specifically what he observed the examiner do, Officer Gottlieb replied: "He used some tools. He—I'm not an expert like that, but he adjusted something in there and then we went down to test fire it and it fired." He further testified that the gun was certified as operable.[15]

There were no witnesses from the Firearms Examination Unit. Only Officer Gottlieb testified as to the examination and testing of the gun. His testimony included the following:

> [STATE]: [Defense counsel] asked you on cross about the tools that the firearms examiner used. Can you describe any of those tools?

---

**15.** The record contains a Test Fire Certificate indicating that the handgun was test fired and found to be operable. It also includes handwritten notes stating: "Striker and gear groups cleaned/lubed. Right grip tightened. Flush." The appellant, however, objected to the admission of the certificate because the firearms examiner was not present at trial to "confirm" it. The trial court sustained the objection, ruling that it was "cumulative" as the officer had already testified to the information on the certificate.

GOTTLIEB: There [sic] are just some small hand tools, precision tools to use on the gun.

[STATE]: What exactly was done that you saw?

 \* \* \* \* \* \*

GOTTLIEB: He tightened up a bolt and he adjusted a mechanism from the interior working of the firearm.

 \* \* \* \* \* \*

[STATE]: Showing you [the handgun] ... Do you see on there any—can you recognize where exactly it was that he tightened?

GOTTLIEB: He took the slide off and he was working inside.

[STATE]: How much time do you think that took?

GOTTLIEB: Probably about five minutes.

Officer Gottlieb testified on re-cross examination that the "five minutes" of work on the gun included the time it took for the examiner to "flush," "clean," and "lube" it.

At the end of the State's case-in-chief, and again after the defense rested, the defense made a motion for judgment of acquittal contending, *inter alia*, that a conviction for possession of a regulated firearm, like a conviction for carrying or transporting a handgun, requires that the gun be operable and the State failed to prove that the handgun recovered from appellant was operable when recovered. The court denied the motion.

Post trial, appellant filed a "Motion to Reconsider the Court's Denial of Defendant's Motion for Judgment of Acquittal on [the possession of regulated firearm counts] of the Indictment, or, In the Alternative For a New Trial." [16] The issue, briefed and argued before the trial court, was whether proof of operability of a regulated firearm was required to sustain the convictions under Public Safety § 5–133 for pos-

---

16. The motion and its supporting memorandum are not in the record before us.

session of a regulated firearm, and if so, whether the evidence at trial established operability.[17]

At the hearing on the issue, the defense argued in favor of the operability requirement, maintaining that possession of a firearm under the Public Safety Article should be construed like similar provisions under the Criminal Law Article, which the defense claimed, by either legislative action or judicial interpretation, require operability. The defense also argued that, because the firearms technician did something beyond mere maintenance to the handgun, which required special knowledge and tools, and there being no evidence that appellant possessed such special knowledge or tools, the gun must be deemed inoperable as a matter of law.

The State argued below that operability is not a requirement as the definition of a "firearm" in Pub. Safety § 5–101(h) includes "the frame or receiver" of a weapon, which by design is incapable of expelling a projectile by the action of an explosive. The State also asserted that, because the definition of a "regulated firearm" in the Public Safety Article was modeled after that found in federal law, and because federal courts have held that operability is not a required element to sustain a conviction for possession of a firearm under the federal statute, operability is not a required element under Pub. Safety § 5–133.

After determining that the definition of a "firearm" in the Public Safety Article was "specifically and identically taken by

---

17. Appellant was convicted of possession of a firearm under Crim. Law § 5–622(b)(1), Pub. Safety § 5–133(b)(1), and Pub. Safety § 5–133(c)(1). *See footnotes 6–8, supra.* Based on the record before us, appellant did not appear to argue below the operability issue with regard to Crim. Law, § 5–622(b)(1). Nor did the trial court address that statute in its "Memorandum And Order Of Court." Moreover, in this appeal, appellant has focused exclusively on whether operability is a requirement under section § 5–133 of the Public Safety Article. Accordingly, our discussion here likewise focuses on whether operability is a required element under Pub. Safety § 5–133. In other words, because the issue was not ruled on below or presented as an issue in this appeal, we will not address whether operability of the firearm is required to sustain a conviction under Crim. Law § 5–622(b)(1).

the Legislature from the federal definition of firearm found in 18 U.S.C. § 921(a)(3)"; [18] that 18 U.S.C. § 922(g) [19] and Pub. Safety § 5–133 regulate and proscribe the same conduct; and that federal courts have "consistently and uniformly held that 18 U.S.C. § 922(g) does not require proof of operability," the trial court concluded that operability is not a requirement under Pub. Safety § 5–133 to sustain a conviction for possession of a regulated firearm.

As an alternate basis for its decision, the trial court concluded that, even if operability is a requirement under the Maryland statute, "sufficient circumstantial evidence did exist for the jury to find that the gun was indeed operable, and that [appellant] was guilty." The court stated:

> Specifically, there was evidence that the weapon contained one round of ammunition in the chamber and two more rounds of ammunition in the weapon's clip. The jury could find that the defendant would not load an inoperable weapon or carry a loaded "inoperable" weapon especially with two rounds in the clip. If the weapon were inoperable, why would there be two rounds in the clip which only can be used if the round in the chamber is fired or otherwise removed. The jury was not required to "park [its] common sense at the door," and heard sufficient circumstantial evidence that the weapon was operable.

---

**18.** 18 U.S.C. § 921(a)(3) reads:

The term "firearm" means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm.

**19.** 18 U.S.C. § 922(g) provides, in pertinent part, that:

It shall be unlawful for any person-
 (1) who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year ... to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

Accordingly, the trial court denied the motion for reconsideration of the denial of the motion for judgment of acquittal or for a new trial. On appeal, appellant contends that the trial court erred in denying his motion. Both the appellant and the State advance essentially the same arguments raised below.

We perceive no error in the trial court's ruling and hold that proof of the operability of the firearm is not required to sustain a conviction for possession of a firearm under Pub. Safety § 5–133. We explain.

Pub. Safety § 5–133 makes it illegal for persons convicted of certain crimes to possess a firearm. Pub. Safety § 5–133(b)(1) provides, in part:

A person may not possess a regulated firearm if the person [among other things]:

(1) has been convicted of a disqualifying crime;

(2) has been convicted of a violation classified as a common law crime and received a term of imprisonment of more than 2 years.

Pub. Safety § 5–133(c)(1) provides in part:

A person may not possess a regulated firearm if the person was previously convicted of:

(1) a crime of violence; or

(2) a violation of [various crimes under the Criminal Law Article].

Section 5–133 itself is silent as to whether the firearm must be operable to sustain a conviction. Therefore, we turn to the defined terms in the statute to determine if the answer we are seeking lies therein. The terms relevant to our discussion are defined in Pub. Safety § 5–101. We will set them out in reverse order:

(p) Regulated firearm.—"Regulated firearm" means:

(1) a **handgun;** or

(2) a firearm that is any of the following specific assault weapons or their copies, regardless of which company

produced and manufactured that assault weapon: [list of assault weapons omitted].

(n) Handgun.—

(1) "Handgun" means a **firearm** with a barrel less than 16 inches in length.

(2) "Handgun" includes a signal, starter, and blank pistols.

(h) Firearm.—

(1) "Firearm" means:

(i) a weapon that expels, is designed to expel, or may readily be converted to expel a projectile by the action of an explosive; or

(ii) **the frame or receiver of such a weapon.**

(2) "Firearm" includes a starter gun.

(Emphasis added.)

The issue we are asked to resolve in this case turns on the construction of the definition of "regulated firearm." Our goal in statutory construction is to "ascertain and effectuate legislative intent." *Whack v. State,* 338 Md. 665, 672, 659 A.2d 1347 (1995) (citing *Jones v. State,* 336 Md. 255, 260, 647 A.2d 1204 (1994) and *Mustafa v. State,* 323 Md. 65, 73, 591 A.2d 481 (1991)). In doing so, we must first look to the plain, normal meaning of the language of the statute. *Property & Casualty Insurance Guaranty Corp. v. Yanni,* 397 Md. 474, 481, 919 A.2d 1 (2007). Moreover, we "construe the statute as a whole so that no word, clause, sentence, or phrase is rendered surplusage, superfluous, meaningless, or nugatory." *Mayor & Town Council of Oakland v. Mayor & Town Council of Mountain Lake Park,* 392 Md. 301, 316, 896 A.2d 1036 (2006). When considering the ordinary meaning of the language of a statute, we consider how the language relates to the purpose and meaning of the act itself. *Id.* But courts may " 'not invade the function of the legislature' by reading missing language into a statute, 'even to correct an omission [that is the result of] obvious . . . inadvertence.' " *Graves v. State,* 364 Md. 329, 351, 772 A.2d 1225 (2001) (citation omitted). Nor may we read a meaning into the statute that is not expressly stated or

clearly implied, so as to expand its meaning. *See Johnson v. Mayor & City Council of Baltimore,* 387 Md. 1, 14, 874 A.2d 439 (2005).

We have found no Maryland cases that directly speak to the precise issue before us. We are persuaded, however, that a firearm need not be operable to sustain a conviction under Pub. Safety § 5–133(b). As noted, "firearm," the operative term here, is defined as "a weapon that expels, is designed to expel, or may readily be converted to expel a projectile by the action of an explosive; **or the frame or receiver of such a weapon.**" (Emphasis added.)

There is no definition of the term "frame or receiver" in the Public Safety Article; however, the term "firearm frame or receiver" is defined by the Code of Federal Regulations as "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." 27 C.F.R. §§ 478.11, 479.11. The definition was adopted in 1978. Commerce in Firearms and Ammunition, 43 Fed.Reg. 13536, 13537 (March 31, 1978) (to be codified at 27 C.F.R. pt.178) and Machine Guns, Destructive Devices, and Certain Other Firearms, 43 Fed.Reg. 13538, 13539 (March 31, 1978) (to be codified at 27 C.F.R. pt.179). Thus, when the General Assembly enacted the Maryland Gun Violence Act of 1996, the term "frame or receiver" had a long-established definition in the context of the federal regulation of firearms. When interpreting a statute, courts presume that the enacting legislative body uses " 'familiar legal expressions in their familiar legal sense,' unless the legislature indicates a contrary intent." *Armstrong v. Mayor of Baltimore,* 410 Md. 426, 448, 979 A.2d 98, 111 (2009) (quoting *Trinity Assembly of God v. People's Counsel,* 407 Md. 53, 92, 962 A.2d 404 (2008)). The "frame or receiver" of a firearm is not, in and of itself, an operable firearm as it is not capable of expelling a projectile by the action of an explosive. This leads to the inference that, when the General Assembly enacted the statutory predecessor to Pub. Safety § 5–133, it did not intend to restrict the definition of the term "firearm" to operable weapons.

The legislative history of § 5–133 supports our conclusion. Chapter 561 of the Laws of 1996, titled the "Maryland Gun Violence Act of 1996," repealed and reenacted, with amendments, *inter alia,* former Article 27, § 445, the predecessor to Pub. Safety § 5–133. The Act was enacted for the stated purpose of, among other things, "providing that certain ... possessions of firearms prohibited under federal law are prohibited under State law;" and "altering certain definitions." 1996 Md. Laws 3139–40. Prior to the Act, Article 27 § 445 prohibited certain persons (including those previously convicted of committing a crime of violence and certain other crimes), from possessing "a pistol or revolver." The pertinent provisions of the Act deleted the phrase "a pistol or revolver" and substituted instead the term "a regulated firearm." The Act also introduced the definitions of "regulated firearm," "handgun," and "firearm" in substantially the same form as that currently codified at Pub. Safety § 5–101(p), (n) and (h) as set forth above.

Since at least 1968, when Congress enacted the Gun Control Act, federal law has proscribed the same conduct as that of Pub. Safety § 5–133. Specifically, 18 U.S.C. § 922(g)(1) of the United States Code provides: "It shall be unlawful for any [restricted] person [including persons convicted of a crime punishable by imprisonment for a term exceeding one year] to ... possess ... any firearm or ammunition...." "Firearm" is defined in 18 U.S.C. § 921(a)(3) as:

(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive;

(B) the frame or receiver of any such weapon;

(C) any firearm muffler or firearm silencer; or

(D) any destructive device.

Such term does not include an antique firearm.

The definition of "firearm" in Pub. Safety § 5–101(h) virtually mirrors that in 18 U.S.C. § 921(a)(3)(A) & (B). By including §§ (C) & (D), the federal definition of "firearm" is somewhat broader than Maryland's definition. Nonetheless,

for our purposes, the two definitions are sufficiently comparable.

Federal cases interpreting a federal statute substantially similar to a subsequently enacted Maryland statute are always useful, and often persuasive, in our interpretation of the latter. *Faulk v. State's Attorney for Harford County,* 299 Md. 493, 506, 474 A.2d 880 (1984) ("Where the purpose and language of a federal statute are substantially the same as that of a later state statute, interpretations of the federal statute are ordinarily persuasive.") *See also Melton v. State,* 379 Md. 471, 496 n. 18, 842 A.2d 743 (2004) ("While [18 U.S.C. § 922(g) is] different from Maryland's statutes, its content is similar, and thus instructive [in an analysis related to penalty provisions], in that the federal statute also makes it illegal for certain classes of individuals to possess certain firearms.")

The United States Courts of Appeal have consistently held that an inoperable weapon falls within the definition of "firearm" under 18 U.S.C. § 921(a)(3). *See United States v. Rivera,* 415 F.3d 284, 286 (2d Cir.2005) ("[E]very ... circuit to consider it has concluded that an inoperable weapon falls within § 921(a)(3)'s definition of a 'firearm.'") and cases cited therein. *See also United States v. Willis,* 992 F.2d 489, 491 n. 2 (4th Cir.1993) ("[W]ere we to [address the defendant's argument] we would find without merit his claim that an inoperable firearm is not a 'firearm' within the meaning of 18 U.S.C. § 921(a)(3).")

The Court of Appeals in *Rivera* explained:

> Where a weapon designed to fire a projectile is rendered inoperable, whether on purpose or by accident, it is not removed from the statute's purview; although it is temporarily incapable of effecting its purpose, it continues to be "designed" to fire a projectile. *See, e.g., United States v. Ruiz,* 986 F.2d 905, 910 (5th Cir.1993) ("The filing down of the gun's hammer did not change the fact that the gun was designed to expel a projectile, but rather it merely temporarily altered the gun's capability to accomplish the purpose for which it was designed."); *United States v. Yannott,* 42

F.3d 999, 1006 (6th Cir.1994) ("The broken firing pin merely temporarily altered the weapon's capability and did not so alter the weapon's design that it no longer served the purpose for which it was originally designed."); *United States v. York,* 830 F.2d 885, 891 (8th Cir.1987) (concluding, where gun was missing its firing pin and where its cylinder did not line up with gun barrel, that gun remained " 'designed to . . . expel a projectile by the action of an explosive.' ")

*Rivera,* 415 F.3d at 286.

Since the federal definition of "firearm" is substantially the same as that in Pub. Safety, § 5–101(h), and the corresponding federal and Maryland statutes regulate essentially the same conduct, we view the federal courts' interpretation of the term "firearm" as persuasive. We hold that, in order to obtain a conviction under Pub. Safety § 5–133, the State need not prove that the firearm in question was operable.[20]

**JUDGMENTS OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY, AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**

---

**20.** As noted by the trial court, there was sufficient evidence from which the jury could reasonably conclude that the firearm was operable. *See York v. State,* 56 Md.App. 222, 227–29, 467 A.2d 552 (1983), *cert. denied,* 299 Md. 137, 472 A.2d 1000 (1984) (jury could conclude handgun was operable, even though weapon could not be fired by the exertion of ordinary pressure on the trigger, based on evidence that handgun could be easily repaired or fired by someone of unusual strength), and *Powell v. State,* 140 Md.App. 479, 481–82, 780 A.2d 1219 (weapon operable even though, at the time of defendant's arrest, it lacked a magazine necessary for weapon to fire because police firearms expert was able to insert a magazine and fire weapon), *cert. denied,* 367 Md. 90, 785 A.2d 1292 (2001). These cases, as well as others, are discussed in detail in *Moore v. State,* 189 Md.App. 90, 108–10, 983 A.2d 583, 594–95, which was decided concurrently with this case.