2013 UT App 272

**STATE of Utah, Plaintiff and Appellee,**

v.

**Cassandra ANDERSON, Defendant and Appellant.**

**No. 20110864–CA.**

Court of Appeals of Utah.

Nov. 21, 2013.

Douglas J. Thompson, for Appellant.

John E. Swallow and Michelle I. Young, for Appellee.

Judge STEPHEN L. ROTH authored this Opinion, in which Judges CAROLYN B. McHUGH and J. FREDERIC VOROS JR. concurred.

Opinion

ROTH, Judge:

¶ 1 Cassandra Anderson appeals from the district court's decision to deny her motion to suppress drug evidence discovered after Anderson was detained by an officer who had been observing her interaction in a parking lot with a woman in another vehicle. Anderson contends that the officer did not have reasonable, articulable suspicion to detain her. We affirm.

## BACKGROUND

¶ 2 At the time of the events leading to this appeal, Sergeant Bryan Robinson was an Orem City police officer who had been assigned to the Utah County Major Crimes Task Force (Major Crimes) for almost three years. Major Crimes focuses on "narcotics and controlled substances[ ] interdiction, gang enforcement and property crimes." Upon joining Major Crimes, Sergeant Robinson received hands-on field training in narcotics interdiction from more experienced detectives, including specific training on "methods to distribute controlled substances," such as hand-to-hand transactions. He kept his knowledge current by attending conferences for narcotics officers twice a year. In the course of his service as a police officer, Sergeant Robinson had "[observed] hundreds of [drug] transactions" and had become familiar with the manner in which they take place. At the time of the stop at issue here, Sergeant Robinson was a team leader for one of the narcotics units. As a higher ranking officer, he "assisted] with the ... Field Training Officer Program," which involves "training ... [new] officers on how to recognize and identify a drug transaction" by "advis[ing] them on operations" like surveillance for drug transactions at a location known to have a lot of drug activity, including "what we're looking for, the list of clues, then ultimately the hand-to-hand transaction."

¶ 3 Among Sergeant Robinson's primary duties as a member of Major Crimes were "set[ting] up controlled buys" of controlled substances and conducting surveillance of known hotspots for drug activity. In connection with these activities, Major Crimes observed and spoke with suspected drug traffickers to learn "where people meet to distribute their controlled substances." One such location was a gas station in Orem, Utah. Major Crimes knew the gas station parking lot to be a common location for drug activity because it had made prior "arrests from that parking lot" for drug crimes and, as a result, had "set up controlled buys there at that location numerous times." Due to the high prevalence of drug activity at this particular gas station, Major Crimes "often used" the parking lot for the "express purpose" of "watching for drug transactions."

¶ 4 On April 27, 2010, Sergeant Robinson and two other members of Major Crimes spent the afternoon watching the parking lot as part of an operation aimed at apprehending distributors of illegal drugs. Around 3:00 or 4:00 p.m., Sergeant Robinson, using binoculars from about 100 feet away, observed a maroon car drive into the parking lot and park in a stall in the northeast corner of the lot, farthest away from the store, despite there being several closer empty parking spaces. The driver, who was subsequently identified as Anderson, remained in the vehicle. Anderson's daughter left the vehicle and entered the convenience store, returning moments later. Approximately ten minutes later, another car entered the lot and parked a few stalls down from Anderson. Anderson got out of her car, walked to the driver's window of the other vehicle, and leaned in to talk to the driver.

¶ 5 During the interaction, Sergeant Robinson observed Anderson make a "hand-to-hand transaction" with the other driver and then place something in her right front pocket. He did not see Anderson give anything to the other driver but testified that such an exchange could have taken place without him seeing it. At that point, Anderson stood up, said a few more words, and then returned to her car. Both vehicles immediately left the parking lot. The entire interaction took less than two minutes.

¶ 6 "Based upon [his] experience and training as a drug enforcement officer," Sergeant Robinson characterized the exchange as "consistent ... with the hand-to-hand drug

transaction." Sergeant Robinson explained that he gave the encounter this characterization due to its brief duration (under two minutes), the manner of the transaction (concealed), and the nature of the item exchanged (small and easily concealable). As a result, Sergeant Robinson pursued Anderson, employing his "red and blue lights" and "chirping [the] siren." Sergeant Robinson had not observed Anderson commit any traffic violations and explained that he made the stop "[t]o detain her and ask her about the transaction" at the gas station.

¶ 7 Sergeant Robinson requested that Anderson exit the vehicle to avoid upsetting her daughter. Anderson agreed and accompanied Sergeant Robinson to the back of the car. Sergeant Robinson then asked Anderson if she had bought or sold anything at the gas station parking lot. Anderson responded that she had not, explaining that she was there simply to collect $100 she was owed and that the money was in her planner inside the vehicle. Sergeant Robinson requested that Anderson show him the contents of her pockets. She removed a total of seven pills, five of which she identified as Percocet and two of which Sergeant Robinson suspected were a prescription pain medication. Anderson reported that she did not have a prescription for at least two of the pills. As Anderson was pulling the pills out of her pocket, she partially exposed a small plastic bag. Sergeant Robinson explained that in his experience, this type of plastic bag is commonly used to package drugs so he grabbed the bag from Anderson's pocket. It contained a substance consistent with methamphetamine. Sergeant Robinson placed Anderson under arrest for possession of controlled substances. While inventorying Anderson's car, Sergeant Robinson found the $100 bill in Anderson's planner.

¶ 8 Subsequent testing confirmed that the substance in the plastic bag was methamphetamine and that two of the pills were "preparation for Oxycodone." The State charged Anderson with two counts of possession of a controlled substance in a drug free zone and one count of possession of drug paraphernalia in a drug free zone.

¶ 9 Anderson filed a motion to suppress the drug evidence, arguing that Sergeant Robinson violated her Fourth Amendment right to be free from illegal seizure because the officer lacked reasonable, articulable suspicion to detain her for investigation.[1] Following oral argument on the suppression motion and after receiving supplemental briefing from the parties, the district court concluded that Sergeant Robinson had reasonable, articulable suspicion sufficient to warrant the intrusion and denied Anderson's motion to suppress. At a subsequent bench trial, the court convicted Anderson on all three charges. Anderson now appeals the denial of the motion to suppress.

## ISSUE AND STANDARDS OF REVIEW

■■■ ¶ 10 The issue before us is whether the district court correctly denied Anderson's motion to suppress on the basis that Sergeant Robinson had reasonable, articulable suspicion to initially detain her. "When reviewing a district court's denial of a motion to suppress, [we] disturb[ ] the district court's findings of fact only when they are clearly erroneous." *State v. Gurule*, 2013 UT 58, ¶ 20, —— P.3d ——, 2013 WL 5458959 (alterations in original) (citation and internal quotation marks omitted). The district court's legal conclusions and application of the law to the facts, however, are reviewed non-deferentially for correctness. *State v. Singleton*, 2005 UT App 464, ¶ 6, 128 P.3d 28. Thus, "we review as a matter of law whether a specific set of facts gives rise to reasonable suspicion." *Gurule*, 2013 UT 58, ¶ 20, —— P.3d —— (citation and internal quotation marks omitted).

## ANALYSIS

¶ 11 The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unrea-

---

**1.** Anderson's motion to suppress further asserted that once Sergeant Robinson asked her to step out of the vehicle and show him what was in her pockets, the detention escalated to an arrest for which the officer lacked probable cause. On appeal, Anderson does not challenge the district court's rejection of that argument, and we do not address it further.

sonable searches and seizures." U.S. Const. amend. IV. " '[S]topping an automobile and detaining its occupants constitute[s] a "seizure" within the meaning of [the Fourth] Amendment[ ], even though the purpose of the stop is limited and the resulting detention quite brief.' " *State v. Hansen*, 2002 UT 125, ¶ 28, 63 P.3d 650 (alterations in original) (quoting *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979)). The lodestar of Fourth Amendment protection, however, is not the preclusion of any seizure but of an *unreasonable* seizure. *State v. Applegate*, 2008 UT 63, ¶ 7, 194 P.3d 925. A traffic stop is reasonable, and therefore constitutional, if the stop "[was] justified at its inception" and if "the detention following the stop was reasonably related in scope to the circumstances that justified the interference in the first place." *Id.* ¶ 9 (alteration in original) (citation and internal quotation marks omitted). Because Anderson is not challenging the scope of the stop following the detention, we address only whether Sergeant Robinson was justified in stopping Anderson in the first place.

¶ 12 "In determining the reasonableness of a … seizure three constitutionally permissible levels of police stops have been outlined." *Id.* ¶ 8 (citation and internal quotation marks omitted). "A brief, investigatory stop of a vehicle constitutes a level two encounter, for which … reasonable, articulable suspicion is required." *Id.* ¶ 9 (citation and internal quotation marks omitted). A police officer has reasonable, articulable suspicion when the officer is "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant th[e] intrusion." *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *accord State v. Alverez*, 2006 UT 61, ¶ 14, 147 P.3d 425. An officer is not required to rule out innocent explanations for behavior that he deems suspicious so long as his suspicion has a basis in reason. *Applegate*, 2008 UT 63, ¶ 10, 194 P.3d 925. But courts will not condone intrusions based merely on an officer's "inarticulate hunch" or "inchoate and unparticularized suspicion" that criminal activity is afoot. *Terry*, 392 U.S. at 27, 88 S.Ct. 1868; *see also Applegate*, 2008 UT 63, ¶ 10, 194 P.3d 925. Rather, "it is imperative

that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief" that the intrusion the officer plans is justified in order to investigate criminal activity? *Terry*, 392 U.S. at 21–22, 88 S.Ct. 1868 (citation and internal quotation marks omitted).

¶ 13 In evaluating whether this "reasonable, articulable suspicion" standard has been satisfied, a court considers the " 'totality of the circumstances' to determine whether, taken together, the facts warranted further investigation by the police officer." *Alverez*, 2006 UT 61, ¶ 14, 147 P.3d 425 (quoting *United States v. Arvizu*, 534 U.S. 266, 274, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002)). In conducting this analysis, courts must "accord deference to an officer's ability to distinguish between innocent and suspicious actions," *State v. Markland*, 2005 UT 26, ¶ 11, 112 P.3d 507 (citation and internal quotation marks omitted), even if that distinction depends on inferences drawn from the circumstances that might " 'elude an untrained person,' " *Singleton*, 2005 UT App 464, ¶ 8, 128 P.3d 28 (quoting *Arvizu*, 534 U.S. at 273, 122 S.Ct. 744).

■ ¶ 14 At both the preliminary hearing and the evidentiary hearing on the motion to suppress, Sergeant Robinson described the circumstances that led him to detain Anderson and explained why he considered those circumstances suspicious. Sergeant Robinson explained that he turned his attention to Anderson from the moment she entered the parking lot because she parked at some distance from the store despite the availability of parking near the store front, an indication that "she was waiting to meet with somebody." Anderson waited there for approximately ten minutes until a second vehicle entered the lot and parked near Anderson's vehicle, again at a distance from the store. Then Anderson, but not the other driver, exited her car and walked to the other vehicle's open driver's window. By this point, Sergeant Robinson was "paying close attention" to the encounter because he expected that if it was a drug transaction, there would be a "sleight of hand." He then

observed a hand-to-hand transaction, after which Anderson slipped something small into her pants pocket. The encounter then quickly ended, and both vehicles immediately left the lot. Sergeant Robinson characterized the encounter as suspicious because, based on his observations of "hundreds of these transactions ... [,] this is how a drug transaction or transactions with controlled substance take[ ] place." Specifically, Sergeant Robinson pointed to the fact that the encounter lasted "less than two minutes" and involved a "sleight of hand," circumstances that he testified were hallmarks of drug transactions that he had previously observed.

¶ 15 Sergeant Robinson acknowledged the possibility that Anderson's behavior was also susceptible to innocent explanations: for example, Anderson may have actually been there to collect the $100 that she later explained the other driver owed her, or the two may have met simply to complete some other lawful transaction. But in his experience, innocent conduct was usually distinguishable. In particular, he testified that the gas station is a common meeting place for the exchange of legal items because of its convenient location just off the interstate. In those cases, however, "the reasons for those meetings are usually pretty apparent." He explained,

> Oftentimes when we're sitting and observing we'll see something that appears to be [a drug transaction], but then the two subjects would meet outside, and they're exchanging items that they've listed on KSL or [eB]ay, but it's done out in the open. You see the object, what they're exchanging.
>
> This wasn't. It was concealed. It was a hand-to-hand transaction [and] most controlled substances dealt with on the street level are small, easily concealed within their hands.

¶ 16 He observed, as well, that when people meet in the lot to buy or exchange legal items, "they conduct their business outside the vehicle and they're talking," while in drug transactions "it's a brief encounter" where "one person usually has to count the money," but then the business is complete. When defense counsel pressed Sergeant Robinson on the fact that the other driver drove a small passenger vehicle that required Anderson to lean down to speak with the driver, suggesting that what appeared furtive was not, Sergeant Robinson conceded that doing so would "be a natural position" to conduct the conversation. But he considered the hand-to-hand transaction that followed, which involved a small item, to have been "secretive" in nature. He also conceded that he would not have been able to distinguish a hand-to-hand exchange of drugs from another similar type of exchange involving small items, such as jewelry or cash. But because, in his experience, that kind of innocent exchange was done more openly and because of the brief nature of the interaction, he suspected that the exchange was likely to be drug-related.

¶ 17 Based on Sergeant Robinson's training, particularly on hand-to-hand exchanges in drug transactions, and his considerable experience observing drug transactions in controlled buys and otherwise, we conclude that he had an objectively reasonable basis to suspect that the behavior he observed that day in the gas station parking lot suggested criminal activity. *See Terry v. Ohio*, 392 U.S. 1, 21–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Sergeant Robinson supported his suspicion with "specific and articulable facts" indicating drug activity was afoot. *See id.* at 21, 88 S.Ct. 1868; *State v. Alverez*, 2006 UT 61, ¶ 14, 147 P.3d 425. Although he acknowledged that Anderson's conduct may have had an innocent explanation, officers need not rule out innocent explanations for behavior deemed suspicious, *State v. Applegate*, 2008 UT 63, ¶ 10, 194 P.3d 925. Rather, we "accord deference to an officer's ability to distinguish between innocent and suspicious actions." *See Markland*, 2005 UT 26, ¶ 11, 112 P.3d 507 (citation and internal quotation marks omitted).

¶ 18 On appeal, Anderson concedes that Sergeant Robinson had observed a hand-to-hand transaction in a known drug trafficking area. However, she contends that this alone is not enough to support reasonable, articulable suspicion. Rather, Anderson asserts that courts in Utah and other jurisdictions have consistently concluded that something in addition to a hand-to-hand exchange in a high

drug trafficking area is necessary for a bare suspicion to mature into a reasonable one. To support her position, Anderson cites *State v. Beach*, 2002 UT App 160, 47 P.3d 932, and *State v. Singleton*, 2005 UT App 464, 128 P.3d 28, as well as a number of cases from other jurisdictions.

¶ 19 In *Beach*, three narcotics interdiction officers were driving in an unmarked patrol car by a known drug house when they saw a vehicle parked partially in the travel lane with no license plates. 2002 UT App 160, ¶ 2, 47 P.3d 932. The officers slowed to maneuver around the parked vehicle and then noticed the defendant "pass something to one of the two individuals in the car." *Id.* Because this type of exchange "is commonly used in drug transactions," the officers turned the car around to pull up behind the parked vehicle. *Id.* When the defendant "began to walk away rapidly in the opposite direction," the officers activated the emergency lights and detained the defendant. *Id.* An officer asked him for permission to search his person, and the defendant produced a baggie of methamphetamine. *Id.* ¶ 5. He was arrested and charged with possession of a controlled substance. *Id.* ¶¶ 5–6. The defendant moved to suppress the drug evidence, asserting that the officers did not have reasonable, articulable suspicion to detain him. *Id.* ¶¶ 6–7. We affirmed the district court's denial of the suppression motion. *Id.* ¶¶ 6, 15.

¶ 20 Anderson asserts that denial of the suppression motion was appropriate in *Beach* because there were facts in addition to the hand-to-hand transaction in a drug activity area that supported the officers' conclusion that the defendant was involved in drug activity. For example, while the officers saw the defendant engage in a hand-to-hand exchange with a person inside a parked vehicle in "proximity to a known drug house," *id.* ¶ 9, the primary reason that the officers' attention was drawn to the three individuals was because they were gathered in and around "a

vehicle without a license plate parked illegally," which caused the officers to have to maneuver around it. In addition, the defendant "walk[ed] rapidly away" once he realized the officers had seen the transaction. Thus, according to Anderson, it was the parking obstruction and the evasion that elevated a hunch based on a hand-to-hand exchange in a high drug activity area to reasonable suspicion that illicit drug activity was transpiring.[2]

¶ 21 In *Singleton*, an officer on patrol around midnight in a residential neighborhood known for drug trafficking observed the defendant engage in a hand-to-hand transaction with another person near a parked vehicle. 2005 UT App 464, ¶ 2, 128 P.3d 28. When the officer pulled his marked patrol car behind the parked vehicle, the defendant turned and walked away while the other person threw something under the vehicle into the snow. *Id.* ¶ 3. The officer detained the defendant based on his suspicions and then arrested the defendant pursuant to an outstanding warrant. *Id.* After transporting the defendant to jail, the officer found fifteen baggies of methamphetamine under the seat of his patrol car. *Id.* ¶ 4. The defendant filed a motion to suppress the drug evidence on the basis that the officer lacked reasonable, articulable suspicion to detain him in the first place. *Id.* ¶ 5. At the motion hearing, the officer testified that "although he did not know what was occurring when he observed the hand-to-hand actions between [the d]efendant and [the other person], based on his training and experience as a narcotics officer, this behavior was consistent with an exchange for drugs." *Id.* The district court agreed with the defendant, however, and suppressed the drug evidence. *Id.* On appeal, we reversed the district court's decision to suppress the evidence, concluding that the officer had sufficiently articulated a reasonable basis for detaining the defendant. *Id.* ¶ 7.

2. We note that the *Beach* court did not cite the defendant's evasion as a factor in reaching its conclusion that the officers had reasonable, articulable suspicion to detain him. *State v. Beach*, 2002 UT App 160, ¶¶ 9–10, 47 P.3d 932 ("[The o]fficer['s] . . . training and experience as a po-

lice officer led him to suspect illegal activity when he observed occupants of a vehicle, which had no license plates and was parked in a manner that obstructed traffic, make a hand-to-hand exchange with a pedestrian.").

¶ 22 Anderson contends that, like the facts in *Beach*, the facts of *Singleton* gave the officer something in addition to a hand-to-hand exchange in a place known for drug activity on which to build a reasonable suspicion, namely the defendant's evasion. *Id.* ¶ 11. Anderson also cites a number of cases from other jurisdictions in support of her claim that something in addition to a hand-to-hand exchange in a high drug activity area is needed to support reasonable suspicion. *See also, e.g., United States v. Johnson*, 627 F.3d 578, 583–84 (6th Cir.2010) (holding that an officer had reasonable, articulable suspicion when he saw the defendant engage in a hand-to-hand exchange of cash for pieces of a small, off-white substance in a high crime area known for drug activity); *Davis v. State*, 351 Ark. 406, 94 S.W.3d 892, 897–98 (2003) (concluding that an officer had reasonable suspicion where he observed a hand-to-hand exchange in a high crime area known for drug activity and the defendant walked quickly away when he saw the officers); *Commonwealth v. Martinez*, No. 98–P–2060, 2000 WL 1477127, at *1 (Mass.App.Ct. July 10, 2000) (affirming the denial of a suppression motion because there had been "reports of drug activity" at the residence the narcotics officers were observing, the defendant made a "quick car stop and [engaged in a] hand-to-hand transaction" with the person who resided there, and upon seeing the officers, the resident threw the bag containing the drugs onto the driveway).

¶ 23 Anderson contends as well that courts across the country have almost universally held that a hand-to-hand transaction in a high drug area, standing alone, is not enough to support reasonable suspicion. *See, e.g., Ray v. State*, 40 So.3d 95, 98 (Fla. Dist.Ct.App.2010) (explaining that under its own precedent, "an officer's observation of hand-to-hand movements between persons in an area known for narcotics transactions, *without more*, does not provide a founded suspicion of criminal activity" (citation and internal quotation marks omitted)); *State v. Carmichael*, 8th Dist. Cuyahoga No. 95618, 2011–Ohio–2921, ¶¶ 5–6, 38, 40, 2011 WL 2436533 (concluding that an officer did not have reasonable, articulable suspicion when he observed a man walk up to a minivan

parked on the street and "hand[ ] something to the passenger," particularly because it was unlikely the officer could have seen the transaction under the conditions). *But see State v. Kelley*, 8 So.3d 684, 688–89 (La.App. 5 Cir.2009) (concluding that an officer patrolling an area of high narcotics activity had reasonable suspicion after he observed a hand-to-hand transaction that lasted approximately five seconds after which the defendant and the other person both left).

¶ 24 We decline to adopt the approach that Anderson advocates. This court has recognized that "officers' observation of a hand-to-hand exchange in an area known for drug trafficking [can be] a sufficient and independent basis for reasonable suspicion [that] the defendant" is engaged in criminal activity. *State v. Singleton*, 2005 UT App 464, ¶ 12, 128 P.3d 28. Anderson asserts that this conclusion was not necessary to the resolution of *Singleton* and is therefore merely dicta. Even if that were the case, however, the Utah Supreme Court has advised courts to avoid a narrow focus in such cases and evaluate the " 'totality of the circumstances' to determine whether, taken together, the facts warranted further investigation by the police officer." *State v. Alverez*, 2006 UT 61, ¶ 14, 147 P.3d 425 (quoting *United States v. Arvizu*, 534 U.S. 266, 274, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002)). We are persuaded that the totality of the circumstances here supports a conclusion that Sergeant Robinson articulated reasonable suspicion to detain Anderson for further investigation.

¶ 25 On the date Anderson was detained, Sergeant Robinson and his two Major Crimes colleagues were not simply patrolling an area known for drug trafficking. They were conducting surveillance on a particular gas station parking lot where Major Crimes had historically observed drug transactions, set up controlled buys, and made drug-related arrests and which it was now targeting for further drug-focused observation based on that history. Sergeant Robinson's attention was drawn to Anderson after she entered the lot, parked away from the store, and waited in her car for ten minutes after her daughter returned from the store for a second person to arrive. When that person did arrive,

Anderson went directly to the car, leaned in through the open driver's window while the other driver remained in the car, received a small object in a hand-to-hand exchange, and then quickly concluded the transaction and left. Although it is possible that Anderson was at the gas station simply to collect the $100 that she claimed she was owed, an officer need not rule out all innocent explanations before reasonable suspicion can arise. *See State v. Applegate,* 2008 UT 63, ¶ 10, 194 P.3d 925. Indeed, Sergeant Robinson acknowledged the possible innocent explanations for Anderson's conduct but explained that he believed the conduct to be suspicious because it was not accompanied by the usual indications of legal exchanges: both parties stepping out of their vehicles, conducting the exchange in the open, and spending some time talking.

¶ 26 Sergeant Robinson was highly experienced in observing drug transactions, particularly those involving hand-to-hand exchanges. He testified that based on the circumstances and his own experiences with drug purchases, even before Anderson left her car, he was "looking for a hand-to-hand transaction" that was "not going to be out in the open." And the occurrence of such an exchange supported his suspicion that the transaction was drug-related because "based on [his] experience" with "arrang[ing]" and observing drug buys, "they're trying to hide something." The two-minute length of the interaction further confirmed his suspicion because with drug exchanges, "it's usually brief," whereas innocent exchanges generally involve the parties talking at greater length.

¶ 27 Though experience and training alone might lead to only a hunch, here Sergeant Robinson articulated a basis in his specific observations of Anderson in the gas station parking lot that day to justify confidence in the suspicion he developed from the application of his training and experience to the facts and circumstances before him. "In conducting [a] reasonable suspicion analysis, officers may 'draw on their own experiences and specialized training to make inferences from deductions about the cumulative information available to them that might well elude an untrained person.'" *Singleton,* 2005 UT App 464, ¶ 8, 128 P.3d 28 (quoting *Arvizu,* 534 U.S. at 273, 122 S.Ct. 744); *see also United States v. Williams,* 271 F.3d 1262, 1270 (10th Cir.2001) (explaining that "officers need not close their eyes to suspicious circumstances," even when there are innocent explanations for the conduct (citation and internal quotation marks omitted)). As a result, we accord deference to this "ability to distinguish between innocent and suspicious actions." *State v. Markland,* 2005 UT 26, ¶ 11, 112 P.3d 507 (citation and internal quotation marks omitted). We conclude that the totality of the circumstances in Anderson's case—like in *Beach* and *Singleton*—supported Sergeant Robinson's belief that criminal activity was afoot. *See State v. Beach,* 2002 UT App 160, ¶ 9, 47 P.3d 932; *see also Singleton,* 2005 UT App 464, ¶ 11, 128 P.3d 28.[3] Accordingly, we affirm the denial of the motion to suppress.

## CONCLUSION

¶ 28 The totality of the circumstances surrounding Sergeant Robinson's detention of Anderson after observing her involved in a hand-to-hand transaction in a parking lot with a high incidence of drug trafficking demonstrates that Sergeant Robinson had reasonable, articulable suspicion to detain Anderson for further investigation to confirm or allay that suspicion. We affirm.

---

**3.** The Maryland Court of Special Appeals reached the same conclusion in a case that is factually similar. There, two officers experienced with hand-to-hand drug transactions were observing a gas station parking lot in an area "known for a lot of drug activity." *Hicks v. State,* 189 Md.App. 112, 984 A.2d 246, 252 (2009) (citation and internal quotation marks omitted). They saw the defendant and his companion waiting, late at night, in a car parked in front of the fuel pumps for fifteen minutes without purchasing gasoline. *Id.* Neither the defendant nor the companion engaged in any business with the store, and when a pedestrian entered the lot, the companion exited the car, completed a hand-to-hand transaction, and returned to the car without conversing with the other person. *Id.* The officers testified that based on their experience, this conduct indicated a drug transaction. *Id.* The court of special appeals held that "[t]he totality of these circumstances support[ed] a reasonable suspicion of drug-related activity." *Id.*