**2021 UT App 85**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
VIENPHET SUNDARA,
Appellant.

Opinion
No. 20190399-CA
Filed August 12, 2021

Third District Court, Salt Lake Department
The Honorable Todd M. Shaughnessy
No. 161900600

Nathalie S. Skibine, Attorney for Appellant

Sean D. Reyes and Jeffrey D. Mann, Attorneys
for Appellee

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGES DAVID N. MORTENSEN and DIANA HAGEN
concurred.

CHRISTIANSEN FORSTER, Judge:

¶1 In a case that had gone unresolved for many years, Vienphet Sundara was convicted in 2019 of a 1991 murder after police reopened their investigation based on modern forensic techniques. Sundara appeals, alleging that his trial counsel rendered ineffective assistance and that the trial court erred in dismissing a juror and in giving a flight instruction. We affirm.

## BACKGROUND[1]

*The Crime*

¶2     On the evening of May 18, 1991, Victim was attending a dance held for the benefit of the Laotian community. The dance was held at a community center in Salt Lake City, Utah. Victim, who had allegedly punched Sundara's older brother about a month before, was described as being "afraid," "scared," and "nervous" during the dance. A friend advised Victim to remain inside at a table among his other friends if he was concerned about his safety because nobody would "do anything" to him with all his friends nearby.

¶3     At around midnight, Victim and two friends left the table and went outside the community center. One friend stood outside to smoke a cigarette, the other friend went to a nearby convenience store to use the payphone, and Victim went to find a spot nearby to urinate. Sundara's friend (Friend) and Sundara's other brother (Brother) were also outside at this point and heard Victim and Sundara arguing. Friend and Brother walked over to the place of the argument, at which point Brother said, "Grab him." Friend grabbed Victim's right arm, and Brother grabbed his left. Friend thought Sundara was going to just punch Victim, but Sundara pulled out a knife, which Friend described as a "Rambo knife." Sundara stabbed Victim and ran from the scene with Friend and Brother.

¶4     About the same time, one of Victim's friends heard a "commotion" that involved "screaming, yelling, like a scuffle." He looked over to see Victim under a streetlight with men

---

1. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Daniels*, 2002 UT 2, ¶ 2, 40 P.3d 611.

"running towards him, as if they were chasing someone." After a moment, the men chasing Victim "ran back towards the side of the building." Victim's friend noticed that "there were some muddy-looking liquids on [Victim's] shirts." The friend ran toward Victim, and Victim uttered, "[T]hey stabbed me." The friend tried to catch Victim as he collapsed and noticed that Victim's shirt was soaked with blood. An off-duty police officer (Sergeant), who was working security at the dance, came to where Victim was lying on the ground. Victim died at the scene.

### The Stop

¶5    At 12:19 a.m. on May 19, Sergeant radioed to report that there had been a stabbing at the community center. He reported that the suspects were "male Orientals"[2] who were traveling westbound in a vehicle of unknown description on 1300 South toward 300 West.

¶6    An officer (Officer), who was patrolling nearby, heard Sergeant's radio dispatch and responded. At 12:21 a.m., Officer saw a "light-colored car with three male Asians" traveling northbound on 300 West and turning right on 900 South, less than a mile from the community center. Officer testified that the traffic was very light at that hour and he saw no other vehicles occupied by individuals of Asian descent.

---

2. We recognize that this term is offensive and antiquated, but we use it here because it was used in communications leading to the stop. *See generally* Yanan Wang, *The Long History and Slow Death of a Word Once Used to Describe Everyone and Everything from Egypt to China as Well as Rugs*, Wash. Post (May 13, 2016), https://www.washingtonpost.com/news/morning-mix/wp /2016/05/13/the-long-history-and-slow-death-of-a-word-used-to-describe-everyone-from-turks-to-the-chinese/ [https://perma.cc/4YBU-9GZ4].

¶7     "Based on the proximity to the area, the proximity in time, and the fact that the suspects and the car were a match,"[3] Officer stopped the car on the collector ramp to I-15 located at 900 South and West Temple. Officer also testified that the "sole basis for stopping" the car was his "suspicion of its involvement in the stabbing" and not for a pattern of illegal driving. Sundara was driving the car, and Brother and Friend were passengers. Sundara initially gave police officers a false name, but Victim's friend was brought to the scene and identified the three individuals as those involved in the earlier altercation. In addition, police confirmed Sundara's true identity by using his photo identification.

*The Evidence*

¶8     Officer "notice[d] some dry but still relatively fresh blood on the clothing, the hands, and on the face" of Sundara. Officer also saw "a large knife with a significant amount of blood on it" on the rear floor of the car.

¶9     Sundara, Brother, and Friend were arrested. The clothing of the three men was seized for forensic analysis. In addition, police swabbed blood stains located on Sundara's face and hand. These swabs, along with samples from Sundara's clothing, tested positive for human blood. Bloodstains on Friend's and Brother's clothes also tested positive for human blood.

¶10     A test of the blood on the knife revealed that it matched Victim's blood type and enzyme type in a grouping that

---

3. This comment was made by Officer at the preliminary hearing, and at this point in the testimony, he had mistakenly said Sergeant had radioed that the suspects were "three male Asians" traveling in a "light-colored vehicle." In fact, Sergeant had not specified the number of suspects or the color of their vehicle.

occurred in about 1 in 26 individuals in the Asian population. Significantly, a fingerprint lift was taken from the blade of the knife. But due to technological limitations in 1991, the analyst was unable to make a match.

¶11  An autopsy of Victim revealed that he suffered three stab wounds—two in the back and one in the lower neck. The wound to the neck "was the fatal injury." The wounds were consistent with wounds that would have been caused by a "single-edge blade" like the knife found in the car Sundara was driving.

¶12  After the investigation in 1991, no charges were filed, and the case went unresolved.

*The Case Is Reopened*

¶13  In a 1994 FBI investigation involving another matter, Friend told an undercover agent that he had been involved in a murder at the community center "a few years ago." Friend claimed that he and another man "held [Victim] down and his friend stabbed him twice, and then that he stabbed him twice." When asked to repeat the story the next day, Friend said that he "held [Victim] down while his friend stabbed him twice." Friend was arrested at that time, but the record does not indicate if he was prosecuted in 1994.

¶14  In 2014, police reopened the murder investigation and reexamined the blood samples, knife, and fingerprint using current forensic techniques.

¶15  A new fingerprint analyst examined the print that was lifted from the knife. This examiner determined that the print was "a comparable print," meaning that it was of "the highest quality" and would yield an "ID or an exclusion." Identifying thirteen unique characteristics on the print, the analyst stated that she was "confident" in her conclusion that the print recovered from the knife matched Sundara's fingerprint.

¶16    DNA testing was also performed on the blood evidence. Bloodstains on Sundara's shirt and pants matched Victim's DNA profile with a statistical frequency of 1 in 157 quintillion[4] for the Asian population. The DNA analyst testified that numbers in the "sextillion or . . . quintillion" range are so "massive" that "the likelihood of . . . getting another profile that's exactly the same, [is] astronomical." Bloodstains on Friend's pants matched Victim's DNA with a frequency of 1 in 1.09 million for the Asian population.

¶17    While the knife itself did not test positive for blood when the case was reopened, the adhesive tape used to lift the fingerprint retained "a bloodstain that was also taken when they took the fingerprint lift" in 1991. The DNA profile from the fingerprint-lift bloodstain matched that of Victim with a statistical frequency of 1 in 1.09 million for the Asian population.

¶18    As part of the new investigation, police interviewed Sundara in Oklahoma, where he resided. Sundara admitted he had been at the community center for the dance and had borrowed his father's car that evening. He recalled giving Friend a ride home. Sundara claimed that he had not known Victim but had heard rumors that he had been stabbed. Sundara remembered being pulled over and suggested that the knife belonged to his father, who used the car for fishing and camping trips. When confronted with evidence that the knife and his clothes from that night tested positive for Victim's DNA, Sundara suggested that "somebody" did "something stupid," like "throw the knife in [his] car." He also said that "a lot of people got a lot of blood that day" because there was "gangster fighting" going on.

---

4. A quintillion is a number equal to a one followed by eighteen zeros. *See Number*, Webster's Third New Int'l Dictionary (2002).

¶19  Sundara was charged with murder for Victim's death. Friend was also charged with murder, but he entered into an agreement with the State and was allowed to plead guilty to manslaughter in exchange for testifying at Sundara's trial.

*Jury Selection*

¶20  The court seated eight jurors and two alternates. We highlight the selection of two jurors because they play an important role in the disposition of this case.

¶21  During the selection process, all the jurors were asked, "Do you have an expectation that there must be scientific or forensic evidence presented in a case before you could make a decision related to the guilt or innocence of a person when the case relates to a Homicide?" Juror 1 answered "Yes" to this question. He explained his answer: "So like, it's more of a preference. I can [vote to convict] based off of, like, you know, other evidence, but I prefer more like forensic." But Juror 1 clarified that despite that preference, if the testimonial evidence was sufficient, he would be willing to vote to convict. Juror 31, who was selected as the first alternate, answered "No" to the question.

*The Protective Order and Replacement with an Alternate*

¶22  Near the end of the second day of trial, the parties and the court learned that someone was trying to serve Juror 1 with a protective order. All parties agreed that if the juror were to be served while at court, coming to the court, or leaving the court, such an event might have a significant impact on the trial.

¶23  At the beginning of the third day of trial, the judge met in chambers with defense counsel (Counsel) and the prosecutor. The prosecutor had learned that the protective order was related to an "ongoing harassment and revenge porn case" and "some type of physical abuse" that could result in a "potential felony,

sexual assault." The detective assigned to the protective order case had "insisted [the alleged victim] come and obtain a protective order for her safety." (Quotation simplified.) Based on the information available to the prosecutor, it was unclear whether the alleged criminal behavior had occurred while Juror 1 was serving on the jury. Moreover, the prosecutor did not know if Juror 1 was aware of the police investigation, but he felt it was safe to "assume that he [was] unaware of the protective order." Indeed, the court had been informed that Juror 1 had not been served with the protective order at that time.

¶24   The prosecutor expressed three concerns about allowing Juror 1 to continue as a juror. First, "[g]iven the fact that at any point in time [Juror 1] could be served anywhere, he could be served tonight, and that may . . . infect the rest of the jury pool." Second, the prosecutor was also concerned that Juror 1's answer of "No" to Question 22 on the jury questionnaire regarding whether the potential juror or any member of his family had ever been accused of a crime other than a minor traffic violation may have been false. And third, being served could impact Juror 1's ability to focus and "concentrate on the case at hand." The prosecutor summed up his concerns by saying, "[T]he thing that we all don't want to have happen here is a mistrial. And if he were to say something to the entire jury pool, we would then be in a situation where we'd have to start all over again, and we're trying to prevent that from happening when we know that this inevitably will happen." Given these concerns, the prosecutor moved that Juror 1 be removed.

¶25   Counsel opposed removing Juror 1, arguing that it was speculative whether he was aware of the investigation: "[I]t appears at least on the strength of what we have before us, he doesn't know about [the investigation]. I don't think he answered the question falsely at all. There's nothing in the reports that I've seen, there's nothing in the petition that would indicate that he's aware that this is an ongoing

investigation . . . ." Insofar as trial strategy was concerned, Counsel argued that removing Juror 1 impacted the way he would have selected jurors: "This is a juror that I wanted to serve and consciously used my [peremptory] challenges [to that end]. . . . I intended that the people who were alternates be alternates . . . . And I used my challenges accordingly. And now to take him out for something that . . . may or may not be the case, I think would be unfair to Mr. Sundara."

¶26 The prosecutor and Counsel agreed that any attempt to interview Juror 1 about his knowledge of the investigation would "taint him . . . by the mere fact of bringing him in."

¶27 The court ultimately excused Juror 1 for two reasons. First, while the court was confident that Juror 1 would not be served while at the courthouse, it reasoned, "he could be served at home at any point during the course of the trial and we would not necessarily have any way of knowing whether he'd been served or not." If he were to be served with the protective order, the court was concerned that Juror 1 "would not be able to devote his full attention to the proceedings of this case" and that he might "discuss this issue [of the protective order] with other members of the jury." Second, the court was concerned that it could not "meaningfully inquire" of Juror 1 whether he "correctly" answered Question 22 "without disclosing to him the existence of the protective order or the existence of the investigation" and "potentially having to advise him of his rights"—events that "everyone agree[d] would disqualify him from serving as a juror."

¶28 After articulating its reasoning and acknowledging Counsel's objection, the court determined that "the best course"

was to excuse Juror 1 and have the first alternate, Juror 31, "serve in his stead."[5] The trial proceeded.

*The Flight Instruction*

¶29 Counsel also objected to a jury instruction on flight. The instruction, which is identical to Model Utah Jury Instruction CR405, read,

> Evidence was introduced at trial that the defendant may have fled or attempted to flee from the crime scene. This evidence alone is not enough to establish guilt. However, if you believe that evidence, you may consider it along with the rest of the evidence in reaching a verdict. It's up to you to decide how much weight to give that evidence.
>
> Keep in mind that there may be reasons for flight that could be fully consistent with innocence. Even if you choose to infer from the evidence that the defendant had a "guilty conscience," that does not necessarily mean he is guilty of the crime charged.

*See* Model Utah Jury Instructions 2d CR405 (2018), https://www.utcourts.gov/resources/muji/inc_list.asp?action=showRule&id=32#405 [https://perma.cc/6GHL-WNJP].

¶30 Specifically, Counsel argued that the instruction implied that Sundara "was at the crime scene," "that he knew that the

---

5. Juror 1 was told in private that he was dismissed at the end of the third day of the trial. The remaining jurors were informed of his departure the following morning. The court told the jurors, "Juror No. 1 has been excused. You should not concern yourself with the reasons for that or consider those—or that fact at all in the context of your deliberations."

crime occurred," and that "he was on his way out of there to escape," when his presence at the crime scene was "a fact that's in dispute." Additionally, Counsel argued that "all the evidence . . . at this point is that there was a car that was described to have three [individuals of Asian descent] in it, and it was stopped at a different location than the [community center]. All that other stuff is almost a judicial instruction that a crime occurred." The prosecutor argued, "There was evidence that these three individuals fled the scene in a vehicle and were stopped by police at a different location than the homicide scene. As such, that would constitute flight from the crime scene." The court agreed and overruled the objection, noting that without the instruction, there was a "risk" that the jury would rely only on the fact that Sundara "was in the vehicle" that allegedly "fled from the scene of the crime . . . to establish guilt beyond a reasonable doubt."

¶31   Following a four-day trial, the jury found Sundara guilty of murder, and the court sentenced him to a prison term of five years to life. He appeals.

ISSUES AND STANDARDS OF REVIEW

¶32   Sundara first contends that Counsel performed ineffectively when he did not file a motion to suppress evidence obtained from the traffic stop. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Ramirez*, 2019 UT App 196, ¶ 13, 455 P.3d 1082 (quotation simplified).

¶33   Second, Sundara has filed a rule 23B motion for a remand to supplement the record on appeal with evidence supporting his claim of ineffective assistance of counsel. *See* Utah R. App. P. 23B. "A remand under rule 23B is available only upon a

nonspeculative allegation of facts, not fully appearing in the record on appeal, which, if true, could support a determination that counsel was ineffective." *Ramirez*, 2019 UT App 196, ¶ 13 (quotation simplified).

¶34    Third, Sundara argues that the trial court erred when it dismissed Juror 1 and replaced him with an alternate juror after it learned that Juror 1 might be served with a protective order during the trial. We review a court's decision to replace a juror with an alternate for abuse of discretion. *Cf. State v. Granados*, 2019 UT App 158, ¶ 39, 451 P.3d 289 (explaining, in the context of discussing how to handle sleeping jurors, that "district courts have considerable discretion in determining how best to resolve the issue").

¶35    Fourth, Sundara asserts that the trial court erred in giving the flight instruction. "We review the trial court's decision to give a flight instruction for correctness." *State v. LoPrinzi*, 2014 UT App 256, ¶ 10, 338 P.3d 253 (quotation simplified).[6]

ANALYSIS

I. The Stop

¶36    Sundara first argues that Counsel was ineffective for not filing a motion to suppress the evidence obtained from the investigatory stop. "To ensure a fair trial, the Sixth Amendment of the U.S. Constitution guarantees the right to effective assistance of counsel." *State v. Campos*, 2013 UT App 213, ¶ 23,

---

6. Sundara also argues that the "cumulative effect of multiple errors was prejudicial." But "there are no errors to accumulate here, rendering the cumulative error doctrine inapplicable in this case." *State v. Wilkes*, 2020 UT App 175, ¶ 20 n.3, 479 P.3d 1142 (quotation simplified).

309 P.3d 1160. A claim of ineffective assistance has two prongs. "First, the defendant must show that counsel's performance was deficient. . . . Second, the defendant must show that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "Because failure to establish either prong of the test is fatal to an ineffective assistance of counsel claim, we are free to address [Sundara's] claims under either prong." *See Honie v. State*, 2014 UT 19, ¶ 31, 342 P.3d 182. Here, because we conclude that Counsel did not perform deficiently, we limit our analysis to the first prong.

¶37 To show that Counsel performed deficiently, Sundara must overcome the presumption that Counsel's decision not to file a motion to suppress "falls within the wide range of reasonable professional assistance." *See Strickland*, 466 U.S. at 689. "The court gives trial counsel wide latitude in making tactical decisions and will not question such decisions unless there is no reasonable basis supporting them." *State v. Clark*, 2004 UT 25, ¶ 6, 89 P.3d 162 (quotation simplified). "Moreover, deficient performance is not determined in a vacuum; rather, it involves asking whether the strategy counsel employed was that of a reasonable, competent lawyer in the real-time context of the proceeding." *State v. Rosen*, 2021 UT App 32, ¶ 9, 484 P.3d 1225 (quotation simplified). And "even where a court cannot conceive of a sound strategic reason for counsel's challenged conduct, it does not automatically follow that counsel was deficient. . . . [T]he ultimate question is always whether, considering all the circumstances, counsel's acts or omissions were objectively unreasonable." *State v. Scott*, 2020 UT 13, ¶ 36, 462 P.3d 350; *see also State v. Ray*, 2020 UT 12, ¶ 36, 469 P.3d 871 ("A reviewing court must always base its deficiency determination on the ultimate question of whether counsel's act or omission fell below an objective standard of reasonableness.").

¶38 Here it was objectively reasonable for Counsel to believe that any motion to suppress the evidence obtained from the

vehicle stop on the night of the murder would have inevitably failed because Officer had reasonable suspicion to stop Sundara's car. And "the failure of counsel to make motions or objections which would be futile if raised does not constitute ineffective assistance." *State v. Alzaga*, 2015 UT App 133, ¶ 73, 352 P.3d 107 (quotation simplified); *see also State v. Makaya*, 2020 UT App 152, ¶ 9, 476 P.3d 1025 ("A futile motion necessarily fails both the deficiency and prejudice prongs of the *Strickland* analysis because it is not unreasonable for counsel to choose not to make a motion that would not have been granted, and forgoing such a motion does not prejudice the outcome.").

¶39 While the Fourth Amendment to the United States Constitution guarantees the right of citizens to be free of "unreasonable searches and seizures," *see* U.S. Const. amend. IV, an investigatory stop is constitutionally permissible if it is supported by a "reasonable, articulable suspicion," *see State v. Anderson*, 2013 UT App 272, ¶ 12, 316 P.3d 949 (quotation simplified). And "a police officer has reasonable, articulable suspicion when the officer is able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion." *Id.* (quotation simplified). However, reasonable suspicion for an investigatory stop is "more than merely an inchoate and unparticularized suspicion or hunch that a defendant is connected to potentially criminal activity. Instead, reasonable suspicion requires a particularized and objective basis, supported by specific and articulable facts." *State v. Jervis*, 2017 UT App 207, ¶ 18, 407 P.3d 1072 (quotation simplified). Moreover, "when reviewing a given factual situation to determine if reasonable suspicion justified a detention, courts must view the articulable facts in their totality and avoid the temptation to divide the facts and evaluate them in isolation." *State v. Markland*, 2005 UT 26, ¶ 11, 112 P.3d 507 (quotation simplified).

¶40    The facts here were sufficient to support a conclusion that reasonable suspicion justified the stop of Sundara's vehicle. For example, in *State v. Markland*, 2005 UT 26, 112 P.3d 507, a deputy responded to a 3:14 a.m. report of screaming near an apartment complex. *Id.* ¶ 2. Arriving a few minutes later, the deputy spotted the suspect walking alone with two bags toward a dead end of a poorly lit street. *Id*. Our supreme court explained "that, viewing the facts in their totality and considering the rational inferences drawn from those facts, [the deputy's] detention of [the suspect] . . . was justified at its inception by a reasonable suspicion that crime was afoot and that [the suspect] was connected to that crime." *Id.* ¶ 21. The court cited as a "critical fact" in the case "a contemporaneous report of suspicious circumstances in the area in which [the suspect] was detained." *Id.* ¶ 25.

¶41    And in *State v. Gallegos*, 2018 UT App 192, 437 P.3d 388, *aff'd*, 2020 UT 19, 463 P.3d 641, an "officer was instructed, based on eyewitness accounts, to look for Hispanic males," who had fled the scene of an assault, "wearing white clothes in a Toyota Camry on a specific dead-end street." *Id.* ¶¶ 5–6, 52. "[W]ithin a minute or two of receiving the description," the officer arrived at the street and found a Hispanic male wearing dark clothes and standing with two women near a Toyota Camry. *Id.* ¶ 52. This court concluded that the matching elements of the description were "articulable facts giving rise to reasonable suspicion that [the suspect]—who [was] Hispanic and was right next to the Camry, on the dead-end street, minutes after the officer had received the report—was involved with the fleeing suspects." *Id.* ¶ 54.

¶42    Here, Officer had received radio dispatch of (1) a contemporaneous report of criminal activity at the community center, (2) a general description of the fleeing suspects as male individuals of Asian descent, (3) a specific location and direction of travel (heading west on 1300 South), and (4) the mode of

travel, all occurring shortly after midnight—a time when there were few people driving in the area. These facts in their totality, along with reasonable inferences from them, meet the threshold of reasonable suspicion justifying Officer's stopping of Sundara's car, and "a reasonable, competent lawyer . . . in the realtime context of trial" could have concluded that Officer had received sufficient information to form a reasonable suspicion and decided not to challenge the stop on that basis. *See State v. Wall*, 2020 UT App 168, ¶ 16, 479 P.3d 355 (quotation simplified). Accordingly, we conclude that Sundara's claim of ineffective assistance fails because Counsel did not render deficient performance by not seeking to suppress evidence found during the stop.

## II. The Rule 23B Motion

¶43    Next, in his rule 23B motion, Sundara argues that facts not contained in the record "establish the deficient performance and prejudice necessary to show" that Counsel's failure to file a motion to suppress constituted ineffective assistance of counsel. Specifically, Sundara seeks to supplement the record with a police report that states that the information police received that the suspects were leaving westbound on 1300 South was provided merely by "some unknown person"[7] (Quotation simplified.) The gist of Sundara's motion is that "a tip from an unknown source does not establish reasonable suspicion" and that Counsel, who was aware of the police report, should have challenged the stop on the ground that the "tip . . . was anonymous, unverified, and uncorroborated." We deny Sundara's motion because even if the facts in the affidavit are

---

7. In his police report, Sergeant wrote that he was talking to the driver of another vehicle leaving the area shortly after the stabbing when "some unk person yelled that the susp's were leaving W/B on 1300 S."

true, they do not support a determination that Counsel was ineffective. *See State v. Higley*, 2020 UT App 45, ¶ 24, 463 P.3d 77 ("The facts alleged [in a rule 23B motion] must be supported by affidavits and, when assumed to be true, must establish both elements of a traditional ineffective-assistance claim." (quotation simplified)).

¶44     "It is well-established in this state that the articulable facts supporting reasonable suspicion may come from an officer's own observations as well as *external information* such as an informant's tip via police dispatch . . . ." *State v. Kohl*, 2000 UT 35, ¶ 13, 999 P.2d 7. And Utah courts have articulated a three-factor framework for analyzing whether an informant's tip provides a basis for reasonable suspicion: "(1) the reliability of the informant, (2) the detail of the information, and (3) corroboration of the tip by the officer's own observations." *Salt Lake City v. Street*, 2011 UT App 111, ¶ 7, 251 P.3d 862; *see also Illinois v. Gates*, 462 U.S. 213, 230 (1983) (agreeing that "an informant's veracity, reliability and basis of knowledge are all highly relevant in determining the value of" an anonymous tip (quotation simplified)). Moreover, an informant's tip is not reviewed in isolation but is considered in the context of "the totality of the circumstances." *See Street*, 2011 UT App 111, ¶ 7 (quotation simplified).

¶45     Applying these factors to the allegations in the affidavit, we conclude that the information Sergeant received about Sundara and his companions was reliable. First, the tip was not anonymous but made by an unidentified person who presumably witnessed Sundara and his companions leaving. "[T]ipsters who are merely unidentified may still be considered highly reliable if the facts indicate that they are citizen-informants." *Id.* ¶ 11. And "veracity is generally assumed when the information comes from an average citizen who is in a position to supply information by virtue of having been a crime victim or witness." *State v. Miller*, 740 P.2d 1363, 1366 (Utah Ct.

App. 1987) (quotation simplified). Second, "although the [unknown person] did not provide extensive detail regarding the suspected criminal activity, the detail [that person] did provide was sufficient to support a reasonable suspicion" because the information concerned the location and direction of travel of the suspects' vehicle that was consistent with the location of the stabbing. *See Street*, 2011 UT App 111, ¶ 13. Third, the information regarding the direction of the travel of the suspects was consistent with Sergeant's own observations at the scene of the crime. Sergeant knew the perpetrators were leaving the community center as evidenced by the fact that he had already stopped another vehicle that was leaving. *See supra* note 7. Moreover, "the fact that [Officer] discovered the vehicle in the location pointed out by the [unknown person] and observed that the vehicle's occupants matched the [person's] descriptions enhanced the reliability of [the] account." *See id.* ¶ 15.

¶46　In sum, even if the additional facts Sundara seeks to add to the record are true, they do not support a determination that Counsel was ineffective for not seeking to suppress evidence found after Sundara's vehicle was stopped and searched. Accordingly, we deny his rule 23B motion.

### III. The Dismissal of Juror 1

¶47　Sundara next contends that the trial court erred when it replaced Juror 1 with an alternate juror. Sundara argues that the defense "wanted [Juror 1] to serve" and had "consciously used peremptory challenges" to seat Juror 1. (Quotation simplified.)

¶48　Rule 17(g) of the Utah Rules of Criminal Procedure provides, "If a juror becomes ill, disabled or disqualified during trial and an alternate juror has been selected, the case shall proceed using the alternate juror." Utah R. Crim. P. 17(g). And rule 18(f) provides that alternate jurors are impaneled "to replace any jurors who are unable to perform or who are disqualified from performing their duties" and that alternate jurors "must

have the same qualifications and be selected and sworn in the same manner as any other juror." *Id.* R. 18(f). Concerning these rules, the question confronted by the trial court was whether Juror 1, because of the potential that he would be served with a protective order during the trial, would be "disqualified" from performing his duties on the jury.

¶49 It is within the trial court's discretion to determine whether a juror is disqualified from serving. *State v. Granados*, 2019 UT App 158, ¶ 39, 451 P.3d 289 (stating that trial courts "have considerable discretion" in determining whether a juror should be disqualified and whether to replace that juror with an alternate). And "we will find that a trial court has abused its discretion only if the trial court's decision was beyond the limits of reasonability" such "that no reasonable person would take the view adopted by the trial court." *State v. Arguelles*, 2003 UT 1, ¶ 101, 63 P.3d 731 (quotation simplified); *accord Shurtleff v. United Effort Plan Trust*, 2012 UT 47, ¶ 13, 289 P.3d 408.

¶50 Here, the trial court's decision to dismiss Juror 1 was in no way unreasonable. The court was presented with a unique set of circumstances. It learned that Juror 1 faced the imminent service of a protective order concerning alleged criminal activity. This circumstance created a conundrum for the court. On the one hand, it raised the possibility that Juror 1 had answered the juror questionnaire untruthfully. But both parties agreed that the court could not ask Juror 1 about his answer without tainting him; knowledge that he was being investigated for criminal activity may have biased that juror against the State because the State would investigate and screen any potential charges against him. On the other hand, doing nothing was not a viable option for the court. If Juror 1 had been served with a protective order during the trial, there was a danger that the effect of being served would prevent him from devoting his full attention to the trial or that he might discuss his legal troubles with other jurors.

¶51    Our supreme court has emphasized

> that trial judges should err on the side of caution in ruling on for-cause challenges and that the scope of judicial discretion accorded a trial judge must be evaluated in light of the ease with which all issues of bias can be dispensed by the simple expedient of replacing a questionable juror with another whose neutrality is not open to question.

*State v. Saunders*, 1999 UT 59, ¶ 51, 992 P.2d 951. That is precisely the course the trial court embraced here. Erring on the side of caution, the court determined that the risk of Juror 1 being disqualified (by becoming aware of the investigation either by being asked about his answer to the questionnaire or by being served with the protective order) was too great. Thus, we discern no error in the court's determination that the "best course" was to replace Juror 1 with an alternate.

¶52    Moreover, even if the trial court improperly replaced Juror 1, Sundara has not shown how he was harmed by this action. Our supreme court has stated, "Even upon finding that a trial court erroneously excluded a juror for cause, we will not reverse the jury verdict if we find the error was harmless. To show prejudice, appellant must demonstrate that the jury that actually sat for the trial was in some way partial or incompetent." *State v. Calliham*, 2002 UT 86, ¶ 47, 55 P.3d 573 (quotation simplified). Sundara has not attempted to show that the jury with the alternate was partial or incompetent. Not only did Sundara pass the jury panel for cause, but there is nothing in the record to suggest that the alternate was in any way biased or incompetent.

¶53    Even though Sundara suggests that he specifically wanted Juror 1 to serve on the jury, "[d]efendants are not entitled to a jury of any particular composition," *Taylor v. Louisiana*, 419 U.S. 522, 538 (1975); rather, they are entitled to an impartial jury

under the Sixth Amendment, *see* U.S. Const. amend. VI. Accordingly, we reject Sundara's contention that Juror 1 should not have been excused because he was specifically chosen—owing to his expressed preference for forensic evidence—as being favorably inclined to Sundara's defense. "It must always be remembered that a party, even in a criminal case, is not entitled to a jury which is favorable . . . , but only to one which is fair and impartial. The right to an impartial jury is one of rejection and not of selection." *United States v. Kline*, 221 F. Supp. 776, 782–83 (D. Minn. 1963); *see also Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 510 n.9 (1984) ("The [jury selection] process is to ensure a fair impartial jury, not a favorable one."); *United States v. Gjokaj*, 555 F. App'x 581, 586 (6th Cir. 2014) ("[The] defendant's perception that the dismissed juror was favorable to his defense does not mean he was prejudiced by replacing her with the impartial alternate. [The] defendant had the right to an impartial jury, not a favorable one." (quotation simplified)).

¶54    In sum, we conclude that the trial court did not exceed its discretion in dismissing Juror 1 and replacing him with the alternate after it learned of the imminent service of the protective order.

### IV. The Flight Instruction

¶55    Lastly, Sundara presents a bifurcated argument that the flight instruction given by the court was improper.

¶56    Sundara first contends that the flight instruction was improper under existing law because the only evidence of flight—Friend's testimony that the men ran after the stabbing—was direct, making the flight instruction "confusing and unnecessary." Put another way, Sundara argues that the flight instruction was improper because

> [t]he jury did not need an instruction about how to draw inferences from this direct evidence. . . . The jury did not need guidance to infer that stabbing someone and running away is evidence of guilt. . . . [Friend] offered direct, not circumstantial, evidence of Sundara's guilt. A flight instruction is only useful to explain the inferences of flight as circumstantial evidence of guilt.

¶57   But the giving of a flight instruction is not predicated on the evidence of flight being necessary to assist the jury in making an inferential leap. "Flight instructions are proper when supported by the evidence, meaning the instructions bear a relationship to evidence reflected in the record." *State v. LoPrinzi*, 2014 UT App 256, ¶ 25, 338 P.3d 253 (quotation simplified). And "a flight instruction bears a relationship to the evidence reflected in the record if the flight occurred after the commission of the crime charged." *Id.* (quotation simplified).

¶58   Here, there is no question that evidence supported the prosecution's theory that Sundara fled the scene. Friend testified explicitly that the three men ran away shortly after the stabbing. In addition, Sundara himself stated that he was at the community center and was later stopped by the police. Moreover, there is no question that the evidence suggested that Sundara left the scene "after the commission of the crime." *See id.* (quotation simplified).

¶59   Sundara cites *State v. Howland*, 761 P.2d 579 (Utah Ct. App. 1988), for the proposition that "confusing and unnecessary" flight instructions are erroneous and likely to mislead the jury. *Id.* at 581. But the fact pattern in *Howland* makes that decision of little relevance to this case. In *Howland*, the defendant had an altercation with a restaurant manager near the store's dumpster. *Id.* at 580. Having lost the "boxing match," the defendant ran away, with the manager in pursuit. *Id.* The

manager caught up to the defendant and wrestled him to the ground, at which point the defendant pulled out a knife. *Id.* The defendant was then disarmed, arrested, and charged with attempted aggravated assault. *Id.* But he was not charged with simple assault for the scuffle at the dumpster. *Id.* The lower court gave a flight instruction, but this court determined that the flight instruction was erroneous because "no flight occurred after commission of the crime charged." *Id.* Thus, the reason that the flight instruction in *Howland* was "confusing and unnecessary" is that it misled the jury "into believing that the incident at the dumpster area—at most a simple assault and a threat of future harm to persons other than [the manager]—met the elements of the crime charged, i.e., aggravated assault." *Id.* at 581. Because there was no evidence (namely, a post-crime flight) supporting the flight instruction, the instruction in *Howland* was erroneous. The fact pattern here is just the opposite—flight occurred right after the commission of the charged crime. So the very circumstance that made the flight instruction "confusing and unnecessary" in *Howland* is altogether absent in the case here.

¶60    Sundara's second argument is that where the defense has objected to the giving of a flight instruction, we should "reconsider [our] precedent sanctioning" them. More forcefully, Sundara argues that we "should hold that flight instructions are disfavored and overrule precedent sanctioning flight instructions any time evidence of flight could be tied to consciousness of guilt." However, Utah Supreme Court precedent approving flight instructions is abundant. *See State v. Franklin*, 735 P.2d 34, 39 (Utah 1987) ("[W]hen there is ample evidence to justify a flight instruction, it is not error to give one so long as it instructs the jury that there might be reasons for flight that are fully consistent with innocence of the crime charged and that even if consciousness of guilt is inferred from flight, it does not necessarily reflect actual guilt."), *overruled on other grounds by State v. Robertson*, 2017 UT 27, 438 P.3d 491; *accord State v. Bales*, 675 P.2d 573, 575 (Utah 1983); *see also State v.*

*Fairclough*, 44 P.2d 692, 697 (Utah 1935) (approving the use of a flight instruction). And this court lacks the authority to overrule Utah Supreme Court precedent. *See Ortega v. Ridgewood Estates LLC*, 2016 UT App 131, ¶ 30, 379 P.3d 18 ("We are bound by vertical stare decisis to follow strictly the decisions rendered by the Utah Supreme Court." (quotation simplified)).

¶61 Because there was evidence Sundara fled after the stabbing occurred, we conclude there was no error in the court providing a flight instruction to the jury. And we remain bound by our supreme court's precedent on this point.

CONCLUSION

¶62 We conclude that Counsel did not render ineffective assistance when he did not file a motion to suppress evidence obtained from Officer's stop of Sundara's vehicle. We also deny Sundara's rule 23B motion because the additional evidence he seeks to admit does not support a determination that Counsel was ineffective, and accordingly, a motion to suppress would not have succeeded. Finally, we find no error in the trial court's decision to replace Juror 1 with an alternate juror and to instruct the jury on flight. Affirmed.

———————